**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| **JACQUELINE GREER,** | Case No.: _____ |
| **Plaintiff,** | |
| **v.** | **JURY TRIAL DEMANDED** |
| **L'ORÉAL USA, INC., L'ORÉAL USA PRODUCTS, INC., SOFT-SHEEN CARSON, LLC, SOFT SHEEN\* CARSON (W.I.), INC., SOFT SHEEN/CARSON, INC., and AVLON INDUSTRIES, INC.,** | |
| **Defendant.** | |

**COMPLAINT**

Plaintiff, Jacqueline Greer, by her undersigned counsel, makes the following Complaint against Defendants, L'Oréal USA, Inc., L'Oréal USA Products, Inc. ("L'Oréal"), Soft-Sheen Carson, LLC, Soft Sheen\* Carson (W.I.), Inc., Soft Sheen/Carson, Inc. ("SoftSheen"), and Avlon Industries, Inc. (collectively, "Defendants"), alleging as follows:

**NATURE OF THE ACTION**

1.      This action arises out of Jacqueline Greer's diagnosis of endometriosis. Ms. Greer's endometriosis was directly and proximately caused by her regular and prolonged exposure to phthalates and other endocrine disrupting chemicals found in Defendants' hair care products.

2.      Plaintiff brings this action against Defendants for claims arising from the direct and proximate result of Defendants, their directors, agents, heirs and assigns, and/or their corporate predecessors' negligent, willful, and wrongful conduct in connection with the design,

1

development, manufacture, testing, packaging, promoting, marketing, distribution, labeling, regulation, and/or sale of their products including Dark & Lovely, Affirm, and Mizani (together, the "Products").

## I.  PARTIES

3.      Plaintiff is, and at all times relevant to this action, was a citizen and resident of the state of North Carolina, with her place of residence being Cornelius, North Carolina in Mecklenburg County.

4.      Defendant L'Oréal USA, Inc. is, and at all times relevant to this action was, incorporated in the State of Delaware with its principal place of business and headquarters located at 575 Fifth Avenue, New York, NY 10017, and process may be served upon its registered agent, Corporation Service Company, 80 State Street, Albany, New York 12207. L'Oréal USA, Inc. is a wholly owned subsidiary of L'Oréal S.A., a global corporation, which at all times relevant to this action was a French corporation having its headquarters and principal place of business in France.

5.      Defendant L'Oréal USA Products, Inc. is, and at all times relevant to this action was, incorporated in the State of Delaware with its principal place of business and headquarters located at 10 Hudson Yards, New York, New York 10001, and process may be served upon its registered agent, Corporation Service Company, 80 State Street, Albany, New York 12207. L'Oréal USA Products, Inc. is a wholly owned subsidiary of L'Oréal USA Products, Inc.

6.      Defendant Soft-Sheen Carson, LLC is, and at all times relevant to this action was, a limited liability company organized in the State of New York with its principal place of business and headquarters located at 80 State Street, Albany, New York 12207 and process may be served upon its registered agent, Corporation Service Company, 80 State Street, Albany, New York

12207. Plaintiff alleges that, at all times relevant to this action, Soft-Sheen Carson, LLC's sole members and sole interested parties are Defendant L'Oréal USA, Inc., incorporated in Delaware with its principal place of business and headquarters at 575 Fifth Avenue, New York, NY 10017. This Court has jurisdiction over Soft-Sheen Carson, LLC based on complete diversity of citizenship between Plaintiff and each member of Soft-Sheen Carson, LLC and Defendants collectively.

7.     Defendant Soft Sheen* Carson (W.I.), Inc. is a Delaware corporation with its principal place of business and headquarters located in Savannah, Georgia, and process may be served upon its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware, 19808. Soft Sheen* Carson (W.I.), Inc. is a wholly owned subsidiary of Defendant L'Oréal USA, Inc.

8.     Defendant Soft Sheen/Carson, Inc. is a Delaware corporation with its principal place of business and headquarters located at 2870 Peachtree Rd., Suite 464, Atlanta, Georgia 40405, and process may be served upon its registered agent, Justin Hill, 2870 Peachtree Rd., Suite 464, Atlanta, Georgia 40405. Soft Sheen/Carson, Inc. is a wholly owned subsidiary of Defendant L'Oréal USA, Inc.

9.     Defendant Avlon Industries, Inc., is, and at all times relevant to this action was, a corporation with its principal place of business and corporate headquarters located at 1999 N 15th Avenue, Melrose Park, Illinois 60160. Process may be served upon its registered agent, Robert Goldstine, at 835 McClintock Drive, Burr Ridge, Illinois 60527.

10.     No Defendant in this action is incorporated in the State of North Carolina, maintains a principal place of business in the State of North Carolina, or has members who are citizens of

3

the State of North Carolina. As Plaintiff Jacqueline Greer is a citizen of the State of North Carolina, complete diversity exists in this action.

11.     At all pertinent times, Defendants were engaged in the research, development, manufacture, design, testing, sale, and marketing of the Products, and introduced the Products into interstate commerce with knowledge and intent that such Products be sold in the State of North Carolina.

12.     At all times material hereto, Defendants developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the defective Products, including but not limited to:

     a.   Dark & Lovely;

     b.   Affirm;

     c.   Mizani.

13.     The Products were placed into the stream of interstate commerce and have been used by the Plaintiff for many years. She has had the Products applied to her own hair dating back to approximately the year 1984 and continuing until 2022.

14.     In or around April 2020, Plaintiff was diagnosed with endometriosis, a diagnosis caused by Plaintiff's exposure to chemicals in the Defendants' aforementioned hair relaxer Products.

## II.   JURISDICTION AND VENUE

15.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy as to the Plaintiff exceeds $75,000.00, exclusive of interest and costs, and Plaintiff and Defendants are residents of different states.

4

16.     Defendants have sufficient minimum contacts with the State of North Carolina and regularly conduct business within the State of North Carolina such that exercising jurisdiction over Defendants would not offend due process or traditional notions of fair play and substantial justice.

17.     Defendants' Products were all sold either directly or indirectly, to members of the general public within the State of North Carolina.

18.     Venue is proper in this district pursuant to 28 U.S.C. §§1391(a) and (b)(2) and 1391(c)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, and the Defendants are subject to this Court's personal jurisdiction. Venue is also proper under 18 U.S.C. § 1965(a) because Defendants transact substantial business in this district.

19.     Upon information and belief, at all times relevant, Defendants were present and transacted, solicited, and conducted business in the State of North Carolina through their employees, agents, and/or sales representatives and derived substantial revenue from such business.

20.     At all relevant times, Defendants expected or should have expected that their acts and omissions would have consequences within the United States and the State of North Carolina.

## III.     FACTS COMMON TO ALL COUNTS

### A.  Hair Straighteners and Relaxers

#### a.  Market for Hair Straightening and Relaxing Products

21.     Black people make up about 13 percent of the U.S. population, but by one estimate, African American spending accounts for as much as 22 percent of the $42 billion-a-year personal

care products market, suggesting that they buy and use more of such products – including those with potentially harmful ingredients – than Americans as a whole.[1]

22.     In an analysis of ingredients in 1,177 beauty and personal care products marketed to Black women, about one in twelve was ranked highly hazardous on the scoring system of EWG's Skin Deep® Cosmetics Database, a free online resource for finding less-hazardous alternatives to personal care products. Maintained by the Environmental Working Group, this database provides information on the safety and potential harms of ingredients in a wide range of skincare products, cosmetics, and other personal care and beauty products. The database provides information on cancer risk, reproductive toxicities, and allergies.[2] The worst scoring products marketed for Black women were hair relaxers, hair colors and bleaching products. Each of these categories had an average product score indicating a high potential hazard.

23.     In the U.S. alone, Black consumers spend over $1 trillion each year on consumer goods, with an outsized spending on hair care products compared to other ethnicities.

24.     In 2020, the global Black hair care market was estimated at $2.5 billion, with the hair relaxer market alone estimated at $718 million in 2021, with the expectation of growth to reach or exceed $854 million annually by 2028.

---

[1] Thandisizwe Chimurenga, *How Toxic is Black Hair Care?,* New America Media, Feb. 2, 2012, www.americamedia.org/2012/02/skin-deep-in-more-ways-than-one.php; *Personal Care Products Manufacturing Industry Profile,* Dun & Bradstreet First Research, August 2016, www.firetresearch.com/Industry-Research/Personal-Care-Products-Manufacturing.html. (this report uses "Black" to describe not only people who identify as African-American, but Black people in the U.S. who come from the Caribbean or other areas. "African-American" is used only when a cited source specifies that term).
[2] https://www.Ewg.org/skindeep/learn_more/about/.

6

### b. History of Hair Relaxers in America

25.     In its natural or virgin state, afro-hair texture is characterized by coiled, springing, zigzag, and s-curve curl patterns; as well as by its density, fullness, texture, and feel. [3]

26.     Afro-texture hair "naturally grows up and out."[4]

27.     In Africa, hair was seen as a source of personal and spiritual power. As the highest point of the body and "most elevated part of the body, some communities believe[d] [their hair] connected them with the divine."[5] For some, hair was the "conduit for spiritual interaction with God."[6]

28.     African hairstyles were status symbols reflecting one's "marital status, age, religion, and rank in society" and tribe.[7] Warriors, kings, and queens wore braids to show their ranking in society.[8] The Wolof tribe in West Africa wore braided styles when they went to war.[9]

29.     Most styling was extremely intricate and involved days of labor. "Only the mad and mourning did not do their hair."[10] Engaging in this process was considered to be necessary, as "only the mad and mourning did not do their hair."[11]

---

[3] Patrick Obukowcho, *Hair Relaxers: Science, Design, and Application,* 26, 14 (2018).
[4] Ayana Byrd & Lori Tharps, *When Black Hair Is Against the Rules,* The New York Times, April 30, 2014,
https://www.nytimes.com/2014/05/01/opinion/when-black-hair-is-against-the-rules.html.
[5] Nikki Fox, *6 Things Everyone Should Know About Black Hair History,* Odele, Feb. 22, 2021.
https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts.
[6] Rumeana Jahangir, *How Does Black Hair Reflect Black History?,* BBC News. May 31, 2015.
https://www.bbc.com/news/uk-england-merseyside-31438273.amp.
[7] *History of Braids: More Than Just a Hairstyle,* Genesis Career College,
https://www.genesiscareer.edu/history-of-braids-more-than-just-a-hairstyle/.
[8] *Id.*
[9] *Id.*
[10] Hlonipha, Mokoena, *From Slavery to Colonialism and School Rules, Navigating the History of Myths about Black Hair,* Quartz Africa, Fe., 24, 2018, https://qz.com/africa/1215070/black-hair-myths-from-slavery-to-colonialism-school-rules-and-good-hair/.
[11] Hlonipha Mokoena, *From Slavery to Colonialism and School Rules, Navigating the History of Myths about Black Hair,* Quartz Africa, Fe., 24, 2018,

7

30.    One of the of first things slave masters did to enslaved people forced to American soil was cut their hair. This was a way to "break their spirit and make slaves easier to control."[12] What was once a symbol of pride and symbolism became a tool for subordination and degradation. As such, hair cutting was also a common form of punishment.

31.    The very nature of slavery involved working long hours in dire conditions. Enslaved people had "no time to care about one's appearance or one's hair."[13] "Hair that was once a source of pride and expression of identity was often tucked away beneath cloth to cover rough, tangled tresses and shield them from hours spent toiling under the sun."[14] The hair that was once an important spiritual and cultural symbol became tangled and matted.

32.    In 1786, Governor Don Esteban Miro of Louisiana passed the "Tignon Law" requiring Black women to wear a tignon (scarf) over their hair as a way of signifying they were members of the slave class, *even if they were free.*[15] "By requiring free Black women to wear the same hair covering, the governor was marking them as related to enslaved women rather than white women."[16] This law sent a direct signal to Black people that their hair held a symbol of inequality and was a sign of poverty regardless of their actual social status.

---

https://qz.com/africa/1215070/black-hairmyths-from-slavery-to-colonialism-school-rules-and-good-hair/.

[12] Brenda A. Randle, *I Am Not My Hair, Race, Gender and Class,* Volume 22, Number 1-2, 114–121 (2015).

[13] Nikki Fox, *6 Things Everyone Should Know About Black Hair History*, Odele, Feb. 22, 2021. https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts.

[14] *Id.*

[15] Nicki Fox, *6 Things Everyone Should Know About Black Hair History,* Odele, Feb. 22, 2021. https://www.odelebeauty.com/blogs/the-rings/black-hair-history-facts.

[16] *Fashionable Rebellion,* Women and the American Story, New York Historical Society Museum and Library, https://www.wams.nyhistory.org/settler-colonialism-and-revolution/settler-colonialism/fashionable-rebellion/.

8

33. Because afro-textured hair was kinky and reflected African heritage rather than European ancestry, afro-textured hair was stigmatized as low social status.[17]

34. Slaves with lighter skin and less coarse hair were favored to work in the home, a far less strenuous position than in the plantation fields.[18]

35. Texturism, the idea that "good hair" is equated with a straighter hair texture, was cemented into American culture during its period of chattel slavery. "Eurocentric beauty standards dictated that coily hair and dark skin were unattractive and inferior"; "lighter skinned and straighter haired slaves were favored and selected for more desirable positions in the house" as opposed to the fields.[19] Thus, "the texture of an enslaved person's hair could determine their value and working conditions, which in turn might impact their overall health, comfort and chances for freedom[.][20] Naturally, Black women strived for a better life in America and were taught that the straighter and less kinky their hair was, the better life they could have.[21] This fueled the desire for tools and products that could straighten Black hair texture.

36. Gone were the days of African pride in African hairstyles. "The goal of grooming the hair had morphed from the elaborate and symbolic designs of Africa into an imitation of White styles adapted to Black kinks and curls."[22]

---

[17] Brenda A. Randle, *I Am Not My Hair,* Race, Gender and Class, Volume 22, Number 1-2, 114-121 (2015).
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] Chanel Donaldson, *Hair Alteration Practices Amongst Black Women and the Assumption of Hatred,* Applied Psychology Opus, https://www.wp.nyu.edu/steinhardt-appsych_opus/hair-alteration-practices-amongst-black-women-and-the-assumption-of-self-hatred/.
[22] Brenda A. Randle, *I Am Not My Hair,* Race, Gender and Class, Volume 22, Number 1-2, 114-121 (2015).

9

37.     In an effort to obtain a better life, many slaves would go to "dangerous lengths to straighten their hair."[23]

38.     Black or afro-textured hair can be manipulated into a straightened state with the use of hair tools and hair products. Prior to the invention of the chemical relaxer in the 1900s, individuals would "press" afro-textured hair with metal hair tools such as the "hot comb." Pressing combs or hot combs are metal hair tools that are first heated on a stove or in a ceramic heater, then pressed into hair strands to temporarily straighten them.[24]

39.     The hot comb was first invented by Frenchman Marcel Grateau who popularized the hair styling tool in Europe in the 1870s in part by advertising in catalogs of major department stores like Sears and Bloomingdales.[25] The hot comb was later modified by Madam C.J. Walker, a trailblazer in the development of Black hair products, to be manufactured with wider comb teeth.[26] With Walker's system, once the comb was heated, a softening ointment was then applied for easier manipulation of Black hair.[27]

40.     Today, afro-textured hair is still often straightened with alternative heat mechanisms rather than with chemicals. However, pressed hair remains susceptible to "shrinkage." Shrinkage is the process by which curly, kinky hair that has been temporarily straightened coils

---

[23] Nicki Fox, *6 Things Everyone Should Know About Black Hair History,* Odele, Feb. 22, 2021. https://www.odelebeauty.com/blogs/the-rings/black-hair-history-facts.

[24] Jaclyn Peterson, *The Price of Beauty,* CTI Charlotte Teachers Institute Curriculum (2021).

[25] Henry Louis Gates, *Madam Walker, the First Black American Woman to Be a Self-Made Millionaire,* PBS 100 Amazing Facts About the Negro, https://www.pbs.org/wnet/african-americans-many-rivers-to-cross/history/100-amazing-facts/madam-walker-the-first-black-american-woman-to-be-a-self-made-millionaire.

[26] Cookie Lommel, Madam C.J. Walker 60 (1993)

[27] *Id.* at 62.

back into its natural state once the hair interacts with water, humidity, or perspiration,[28] creating a shorter or fuller appearance.

41.     Today, afro-textured hair is still often straightened with alternative heat mechanisms rather than with chemicals. However, pressed hair remains susceptible to "shrinkage." Shrinkage is the process by which curly, kinky hair that has been temporarily straightened coils back into its natural state once the hair interacts with water, humidity, or perspiration,[29] creating a shorter or fuller appearance.



42.     African American inventor Garrett Augustus Morgan discovered and created a system that would permanently straighten afro-textured hair and eliminate the issue of "shrinkage."

43.     In addition to being an inventor, Morgan was also a tailor. In the early 1900s, Morgan was repairing his sewing machines and wanted to find a way to polish the needles to stich fabrics more smoothly.[30] He applied a chemical solution to the needles and wiped the solution off

---

[28] *Id.*
[29] *Id.*
[30] Patrick Obukowcho, *Hair Relaxers: Science, Design, and Application,* 27 (2018).

with a rag. Morgan soon noticed that the "curly" fibers in the rag were straightened after exposure to the chemical.[31]

44. Morgan further tested the chemical on a dog with curly hair and eventually on his own hair. The chemical solution successfully straightened curly hair. He turned his formula into a gel-hair product, creating the G.A. Morgan Hair Refining Cream which was marketed in 1913.





---

[31] Mary N. Oluonye, Garrett Augustus Morgan: Businessman, Inventor, Good Citizen, 28 (2008).

45. Morgan's invention paved the way for the alkaline relaxer and later development of additional chemical-based permanent hair straightening products in the Black hair care market.[32]

### c. Defendants' Marketing Efforts

46. In 1971, Carson, since acquired by L'Oreal and merged with SoftSheen, manufactured the first lye relaxer. The formula consisted of sodium hydroxide, water, petroleum jelly, mineral oils, and emulsifiers.[33]

47. In the 1970s, lye relaxer users and manufacturers noticed that the lye formula stripped proteins from the hair strand, resulting in the hair thinning and breaking.[34] As a result, Johnson & Johnson marked the first "gentle" hair relaxer in 1981, which used milder chemicals such as potassium hydroxide and lithium hydroxide.[35]

48. Over time, Soft & Beautiful and other chemical relaxer manufacturers developed herbal and botanical hair relaxer formulas.[36]

49. Today, Defendants market their hair relaxer products to Black customers across the United States, and the world, reinforcing the same historical Eurocentric standards of beauty. Defendants' marketing schemes rely heavily on branding and slogans that reinforce straight hair as the preferred standard.[37]

---

[32] Patrick Obukowcho, *Hair Relaxers: Science, Design, and Application,* 27 (2018).
[33] Cicely A. Richard, *This History of Hair Relaxers,* September 29, 2017, https://www.classrooms.synonym.com/the-history-of-hair -relaxers-12078983.html.
[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id.*

13

50. Defendant L'Oréal markets its Product Mizani as a Butter Blend relaxer for fine hair with a moisturizing blend of natural ingredients including Honey, Shea Butter, and Coca Butter.



51. Defendant Avlon Industries, Inc. markets its Product Affirm as a Crème relaxer for sensitive scalps and containing natural ingredients including Argan Oil, Papua Oil, and Cupuacu Butter.



### d. Chemical Relaxer Use

52. Hair relaxers are classified as creams or lotions which are specifically marketed to Black and Brown women to "tame" their ethnic hair by making it smoother, straighter, and easier to manage on a daily basis.

53. Hair relaxing, or lanthionization, can be performed by a professional cosmetologist in a salon or barbershop, or at home with at-home relaxer kits designed for individual use. These

14

home kits are sold in grocery, drug, beauty, and other retail supply stores in urban and rural cities throughout the United States.

54. Relaxers are applied to the base of the hair shaft and left in place for a "cooking" interval, during which the relaxer alters the hair's texture by purposefully damaging the hair's natural protein structure. The effect of this protein damage straightens and smooths the hair. After a period of weeks (4-8 weeks on average), depending on the hair's natural growth rate, the treated portion of the hair grows away from the scalp as new growth sprouts from the roots, requiring additional relaxer treatment to smooth the roots. These additional treatments are colloquially referred to in the community as "re-touches," resulting in women relaxing their new growth every four to eight weeks on average, typically for decades.

55. Hair relaxers can, and often do, cause burns and lesions on the scalp, facilitating introduction of hair relaxer chemicals into the body. The main ingredient of "lye" relaxers is sodium hydroxide; no-lye relaxers contain calcium hydroxide and guanidine carbonate, and "thio" relaxers contain thioglycolic acid salts. No-lye relaxers are advertised to cause fewer scalp lesions and burns than lye relaxers, but there is little evidence to support this claim.

56. Some studies show that up to 90% of Black and Brown women have used hair relaxants and straighteners. Hair relaxers contain hormonally active and carcinogenic compounds, such as phthalates, known to cause endocrine disruption, which are not required to be listed separately as ingredients and are often broadly lumped into the "fragrance" or "perfume" categories of ingredients. Relaxer habits usually begin in the formative childhood years, and adolescence is a period of enhanced susceptibility to debilitating conditions resulting from exposure to these chemicals.[38]

---

[38] Patrick Obukowcho, Hair Relaxers: Science, Design, and Application 27 (2018).

15

57. In the 1990s, the first relaxer product for young Black girls, Just for Me ™, hit the market with a catchy advertising jingle that captured consumer attention.[39] It soon became one of the most popular straightening treatments, touting a no-lye formula designed to be gentler for children's sensitive scalps.

58. Once relaxer use begins in childhood, it usually becomes a lifetime habit. The frequency of scalp burns with relaxer application can increase the risk of permanent and debilitating diseases associated with long-term exposure to endocrine-disrupting chemicals.

59. The reasons for Black women's use and dependence upon hair straightening products are associated with a range of factors, including (1) slavery and internalization of acceptable beauty norms, (2) media and advertisements, (3) assimilation and economic security, (4) ease of hair maintenance, and (5) culture.[40]

60. In a culture where Black features have historically been deemed less attractive, the decision to begin and continue using products to alter the natural state of their hair serves as a protective mechanism against racial discrimination.

---

[39] Dana Oliver, *The 90s Just For Me Hair Relaxer Commercial Song Is Stuck In Our Heads,* HuffPost, Feb. 1, 2014. https://www.huffpost.com/entry/just-for-me-hair-relaxer-commercial-song_n_4689981.
[40] Chanel Donaldson, *Hair Alteration Practices Amongst Black Women and the Assumption of Self-Hatred,* Applied Psychology Opus,
https://www.wp.nyu.edu/steinhardt-appsych_opus/hair-alteration-practices-amongst-black-women-and-the-assumption-of-self-hatred/.

16

61.     In the Dove CROWN Research Study for Girls (2021)[41] conducted by JOY Collective, the following statistics was discovered:

a.  100% of Black elementary school girls in majority-white schools who report experiencing hair discrimination state they experienced the discrimination by the age of 10.

b.  86% of Black teens who experience discrimination state that they have experienced discrimination based on their hair by the age of 12.

c.  66% of Black girls in majority-white schools report experiencing hair discrimination compared to 45% of Black girls in all school environments.

d.  53% of Black mothers, whose daughters have experienced hair discrimination, say their daughters experienced the discrimination as early as 5 years old.

e.  47% of Black mothers report having experienced discrimination related to their hair.

f.  Trauma from these experiences cause girls to miss days from school; teenage Black girls are missing a week of school per year due to hair dissatisfaction.

g.  While 90% of Black girls believe their hair is beautiful, the microaggressions and discrimination they endure have an impact on how they see themselves.

h.  Black women are one and a half times more likely to be sent home from the workplace because of their hair.

i.  Black women are 89% more likely than white women to agree with this statement, "I have to change my hair from its natural state to fit in at the office."

---

[41] JOY Collective, *Dove CROWN Research Study for Girls* (2021), https://static1.squarespace.com/static/5edc69fd622c36173f56651f/t/623369f7477914438ee18c9b/1647536634602/2021_DOVE_CROWN_girls_study.pdf.

62.     The CROWN Act of 2021[42] is a legislative bill introduced in both houses of Congress to address discrimination against protective hair styles worn predominantly by women of color. While the bill has not yet passed fully on a federal level, eighteen states have signed a version of the bill into state law. Unless and until the CROWN Act makes hair discrimination illegal in every state, teenagers and women of color continue to face discriminatory practices related to their hair choices, with relaxing and straightening their hair being a defensive, yet dangerous and toxic option.

### e.     Regulatory Framework

63.     The law does not require cosmetic products and ingredients, other than color additives, to have FDA approval before they go to market. But there are laws and regulations that apply to cosmetics. The two most important laws pertaining to cosmetics marketed in the United States are the Federal Food Drug and Cosmetic Act ("FD&C Act") and the Fair Packaging and Labeling Act ("FPLA").

64.     The FD&C Act expressly prohibits the marketing of "adulterated" or "misbranded" cosmetics in interstate commerce.

65.     Adulteration refers to a violation involving product composition whether it results from ingredients, contaminants, processing, packaging, shipping, or handling.

66.     Under the FD&C Act, a cosmetic is adulterated if: 1) it bears or contains any poisonous or deleterious substance causing injury to the product user, and 2) if its container is

---

[42] The CROWN Act was created in 2019 by Dove and the CROWN Coalition, in partnership with then State Senator Holly J. Mitchell of California, to ensure protection against discrimination based on race-based hairstyles by extending statutory protection to hair texture and protective styles such as braids, locks, twists, and knots in the workplace and public schools. https://www.thecrownact.com/.

18

composed in whole or in part, of any poisonous or deleterious substance which may render the contents injurious to health.

67.     Misbranding refers to violations involving improperly labeled or deceptively packaged products.

68.     Under the FD&C Act, a cosmetic is misbranded if: 1) labeling is false or misleading; 2) the label does not include all required information; 3) required information is not prominent and conspicuous; or 4) the packaging and labeling is in violation of an applicable regulation issued pursuant to Sections 3 and 4 of the Poison Prevention Packaging Act of 1970.[43]

69.     Under United States law, cosmetic manufacturers are not required to submit their safety data to the FDA. However, it is against the law to put an ingredient in a cosmetic that makes the cosmetic harmful when used as intended.[44] An example is methylene chloride because it causes cancer in animals and is likely to be harmful to human health too.[45]

70.     On May 19, 2022, the FDA issued a rule to amend its food additive regulations to no longer provide for most previously authorized phthalates to be used as food additives, and these uses have purportedly been abandoned by industry.[46] The FDA revoked authorizations for food contact use of 23 phthalates and two other substances used as plasticizers, adhesives, defoaming agents, lubricants, resins, and slimicides.[47]

---

[43]  Food and Drug Administration Cosmetic Act § 602 (1938).
[44]  *Prohibited & Restricted Ingredients in Cosmetics,* U.S. Food and Drug Administration, https://www.fda.gov/cosmetics/cosmetics-law-regulations/prohibited-restricted-ingredients-cosmetics.
[45]  21 Code of Federal Regulations § 700.19.
[46]  § 87FR 31080.
[47]  *Phthalates in Food Packages and Food Contact Applications,* U.S. Food and Drug administration, https://www.fda.gov/food/food-ingredients-packaging/phthalates-food-packaging-and-food-contact-applications.

71.     Companies and/or individuals who manufacture or market cosmetics have a legal responsibility and duty to ensure the safety of their own products. Neither the law nor FDA regulations require specific tests to demonstrate the safety of individual products or ingredients, and the law also does not require cosmetic companies to share their safety information with the FDA.

72.     The FDA has consistently advised manufacturers to use whatever testing is necessary to ensure the safety of products and ingredients, which may be substantiated through (a) reliance on already available toxicological test data on individual ingredients and on product formulations that are similar in composition to the particular cosmetic, and (b) performance of any additional toxicological and other tests that are appropriate in light of such existing data and information.[48]

73.     Except for color additives and ingredients prohibited or restricted by regulation, a manufacturer may use any ingredient in the formulation of a cosmetic, provided that (1) the ingredient and the finished cosmetic are safe under labeled or customary conditions of use, (2) the product is properly labeled, and (3) the use of the ingredient does not otherwise cause the cosmetic to be adulterated or misbranded under the laws the FDA enforces.[49]

74.     With respect to whether the product is properly labeled, Title 21 of the Code of Federal Regulations defines the manufacturer's duty to warn consumers of potential health hazards. Section 740.1 states that "[t]he label of a cosmetic product ***shall*** bear a warning statement whenever necessary or appropriate to prevent a health hazard that ***may*** be associated with the

---

[48] *FDA Authority Over Cosmetics: How Cosmetics Are Not FDA-Approved, but are FDA-Regulated,* U.S. Food and Drug Administration, Mar. 3, 2005, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over-cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated.
[49] *Id.*

product." (Emphasis added). This warning mandate directly correlates with the broad authority of manufacturers over their own cosmetic products to ensure that products are safe under labeled or customary conditions of use, properly labeled, and not adulterated or misbranded under FDA laws.

75.     In short, under the current regulatory framework in the United States, it is incumbent upon the manufacturers of cosmetic products, and them alone, to assess the safety and efficacy of their products, and to warn consumers any time a health hazard may be associated with their products. Here, a wealth of scientific information is available regarding long-term use of hair relaxers, straighteners, and hair dyes as containing certain endocrine-disrupting chemicals, which should have alerted manufacturers of these products to the specific and dangerous harms associated with their products when used as intended, particularly in women of color. Defendants' Products contain no such warnings.

### f.     Endocrine-Disrupting Chemicals

76.     The endocrine system is vital for life and influences nearly every cell, organ, and process in the body.[50]  The endocrine system helps regulate all biological processes in the body from conception through adulthood, including the development of the brain and nervous system, the growth and function of the reproductive system, as well as metabolism and blood sugar maintenance.[51]

77.     The endocrine system is a tightly regulated system made up of glands that produce and release precise amounts of hormones that bind to receptors located on specific target cells throughout the body.[52]

---

[50] *Endocrine System: The Endocrine System Includes the Thyroid, Adrenals, and the Pituitary Gland,* Science Direct, https://www.sciencedirect.com/topics/psychology/endocrine-system.
[51] *Endocrine Disruption,* United States Environmental Protection Agency, Mar. 7, 2022, https://www.epa.gov/endocrine-disruption/what-endocrine-disruption.
[52] *Id.*

21

78.     Hormones, such as estrogen, testosterone, progesterone, and androgen, control or regulate critical biological processes.[53]

79.     When a hormone binds to a target cell's receptor, the receptor carries out the hormone's instructions, the stimulus, and either switches on or switches off specific biological processes in cells, tissues, and organs.[54]

80.     The precise functioning of the endocrine system is vital to maintain hormonal homeostasis within the body. A slight variation in hormone levels can lead to significant adverse-health effects, including reproductive impairment and infertility, cancer, cognitive deficits, immune disorders, and metabolic syndrome.[55]

81.     Endocrine disrupting chemicals ("EDCs") are chemicals, or chemical mixtures, which interfere with the normal activity of the endocrine system.

82.     EDCs can act directly on hormone receptors as mimics or antagonists, or on proteins that control hormone delivery.[56]

83.     EDCs disrupt the endocrine system and interfere with the body's hormonal regulation and homeostasis in several ways.

84.     EDCs can cause the body to operate as if there were a proliferation of a hormone and thus over-respond to the stimulus or respond when it was not supposed to by mimicking a natural hormone.

---

[53] *Id.*

[54] *Id.*

[55] *Id.;* Michele La Merrill, et al., *Consensus on the Key Characteristics of Endocrine-Disrupting Chemicals as a Basis for Hazard Identification,* Nature Reviews Endocrinol, Nov. 12, 2019, https://www.nature.com/aricles/s41574-019-0273-8.

[56] Evanthia Diamanti-Kandarakis, et al., *Endocrine-Disrupting Chemicals: An Endocrine Society Scientific Statement,* Endocrine Reviews, June 30, 2009, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2726844.

22

85.     EDCs can increase or decrease the levels of the body's hormones by affecting the production, degradation, and storage of hormones.

86.     EDCs can block the hormone's stimulus through inducing epigenetic changes, modifications to DNA that regulate whether genes are turned on or off or altering the structure of target cells' receptors.[57]

87.     EDCs are known to cause numerous adverse human health outcomes including endometriosis, impaired sperm quality, abnormalities in reproductive organs, various cancers, altered nervous system and immune function, respiratory problems, metabolic issues, diabetes, obesity, cardiovascular problems, growth, and neurological and learning disabilities.[58]

88.     EDCs that mimic the effects of estrogen in the body may contribute to disease risk because exposure to estrogen, both endogenously and exogenously, is associated with uterine and ovarian cancers, and a woman's lifetime risk of developing the diseases increases with greater duration and cumulative exposure.

89.     Natural and synthetic EDCs are present in hair products under the guise of "fragrance" and "perfumes," and thus enter the body when these products are applied to the hair and scalp. Studies exploring this issue have thus far classified EDCs as estrogens, phthalates, and parabens.

90.     Indeed, numerous studies spanning more than two decades have demonstrated the adverse impact EDCs, including Di-2-ethylhexylphthalate, have on the male and female

---

[57] Luis Daniel Martinez-Razo, et al., *The impact of Di-(2-ethylhexyl) Phthalate and Mono(2-ethylhexyl) Phthalate in placental development, function, and pathophysiology,* Environment International, January 2021, https://www.sciencedirect.com/science/article/pii/S0160412020321838?via%3Dihub.

[58] *Endocrine Disrupting Chemicals (EDCs),* Endocrine Society, Jan. 24, 2022, https://www.endocrine.org/patient-engagement/endocrine-library/edcs.

reproductive systems such as inducing endometriosis, abnormal reproductive tract formation, decreased sperm counts and viability, pregnancy loss, and abnormal puberty onset.[59]

### g. Phthalates

91.     Phthalates are used in a variety of cosmetics and personal care products. Phthalates are chemical compounds developed in the last century that are used to make plastics more durable. These colorless, odorless, oily liquids are also referred to as "plasticizers" based on their most common uses.

92.     Phthalates also function as solvents and stabilizers in perfumes and other fragrance preparations. Cosmetics that may contain phthalates include nail polishes, hair sprays, aftershave lotions, cleansers, and shampoos.

93.     Upon information and belief, at all relevant times herein, phthalates were used in Defendants' Products.

94.     Phthalates are chemicals used to improve the stability and retention of fragrances and to help topical products stick to and penetrate the skin and hair.[60]

95.     Phthalates are known EDCs which interfere with natural hormone production, regulation, and degradation, and are detrimental to human health.[61]

96.     Phthalates are commonly used by cosmetics and hair care product manufacturers to make fragrances and colors last longer, and to make hair more flexible after a product is applied, among other uses.

---

[59] Hee-Su Kim, et al., *Hershberger Assays for Di-2-ethylhexyl Phthalate and Its Substitute Candidates,* Dev Reproduction, Mar. 22, 2018, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5915764/.
[60] Olivia Koski & Sheila Hu, Fighting Phthalates, National Resources Defense Council, April 20, 2022, https://www.nrdc.org/stories/fighting-phthalates.
[61] Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health,* Healthcare (Basel) 9, 603, May 9, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593.

24

97.     Phthalates can be found in most products that have contact with plastics during production, packaging, or delivery. Despite short half-lives in tissues, chronic exposure to phthalates adversely influences the endocrine system and functioning of multiple organs, have negative long-term impacts on the success of pregnancy, child growth and development, and reproductive systems in both young children and adolescents. Several countries have imposed restrictions and regulations on some types of phthalates.[62]

98.     Phthalates have been shown to disrupt the endocrine system.[63]

99.     Defendants' Products referenced herein contain phthalates, including Di-2-ethylhexylphthalate. Di-2-ethylhexylphthalate[64] ("DEHP") is a highly toxic manufactured chemical[65] that does not occur naturally in the environment.[66]

100.    DEHP is a phthalate.[67]

101.    Under the authority of the Fair Packaging and Labeling Act ("FPLA"), the FDA requires an ingredient declaration on cosmetic products sold at the retail level to consumers.

102.    However, the regulations do not require the listing of the individual fragrance or flavor ingredients, meaning phthalates evade listing when combined with a fragrance. As a result, consumers, including Plaintiff, are not able to determine from the ingredient declaration on the

---

[62] *Id.*
[63] *Id.*
[64] Also known as Bis(2-ethylhexyl) phthalate.
[65] Sai Rowdhwal & Jiaxing Chen, *Toxic Effects of DI-2-ethylhexyl Phthalate: An Overview,* Biomed Research International, Feb. 22, 2018, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5842715/#:~:text=DEHP%20is%20noncovalently%20bound%20to,and%20plastic%20waste%20disposal%20sites.
[66] *Toxicological Profile for Di(2_ethylhexyl) Phthalate (DEHP),* U.S. Dept of Health and Human Services, January 2022, https://www.atsdr.cdc.gov/ToxProfiles/tp9.pdf. (DEHP are listed as hazardous pollutants under the Clean Air Act.; DEHP is on the Proposition 65 list because it can cause cancer and birth defects or other reproductive harm).
[67] Di(2-ethylhexyl) phthalate (DEHP), Proposition 65, California. Gov, https://www.p65warnings.ca.gov/fact-sheets/di2-ethylhexylphthalate-dehp.

label if phthalates were present in a fragrance used in the herein-referenced hair Products placed into the stream of commerce by Defendants and used by the Plaintiff.

103. Since 1999, the Centers for Disease Control and Prevention ("CDC") has found phthalates in individuals studied for chemical exposure.[68] The National Toxicology Program (NTP) evaluated DEHP in the Fifteenth Report on Carcinogens and found it reasonably anticipated to be a human carcinogen based on sufficient evidence of carcinogenicity from studies in experimental animals, however the data available from cancer studies on humans was found to be inadequate to fully evaluate the relationship between human cancers and DEHP exposure.[69]

104. DEHP was first used in 1949 in the United States and was the most abundantly used phthalate derivative in the 20th century.[70]

105. DEHP does not covalently bind to its parent material. Non-covalent bonds are weak and, as a result, DEHP readily leaches from its products, increasing human exposure.[71]

106. Humans can be exposed to DEHP through ingestion, inhalation, and dermal contact for their lifetimes, including intrauterine life.[72]

---

[68] *Biomarkers Groups,* National Report on Human Exposure to Environmental Chemicals, Center for Disease Control,
https://www.cdc.gov/exposurereport/pdf/Biomarker_Groups_Infographic-508.pdf.
[69] NTP (National Toxicology Program). 2021. Report on Carcinogens, Fifteenth Edition. Research Triangle Park, NC: U.S. Department of Health and Human Services, Public Health Service. https://ntp.niehs.nih.gov/go/roc15 DOI: https://doi.org/10.22427/NTP-OTHER-1003.
[70] Pinar Erkekoglu & Belma Kocer-Gumusel, *Environmental Effects of Endocrine-Disrupting Chemicals: A Special Focus on Phthalates and Bisphenol A,* Environmental Health Risk, June 16, 2016, https://www.intechopen.com/chapters/50234.
[71] Katelyn H. Wong & Timur Durrani, *Exposures to Endocrine Disrupting Chemicals in Consumer Products – A Guide for Pediatricians,* Current Problems in Pediatric and Adolescent Health Care, Science Direct, May 2017,
https://www.sciencedirect.com/science/article/pii/S1538542217300822?via%3Dihub.
[72] Schmidt, Juliane-Susanne, et al., *Effects of Di(2-ethylhexyl) Phthalate (DEHP) on Female Fertility and Adipoenesis in C3H/N Mice,* Environmental Health Perspective, May 15, 2012, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3440070.

26

107.    The Agency for Toxic Substances and Disease Registry ("ATSDR") estimates that the range of daily human exposure to DEHP is 3-30 µg/kg/day.[73]

108.    The no-observed-adverse-effect level for DEHP to humans is 4.8 mg/kg bodyweight/day and the tolerated daily intake (TDI) is 48 µg/kg bodyweight.[74]

| Endpoint | Cancer (NSRL) | | Developmental and Reproductive Toxicity (MADL) | |
|---|---|---|---|---|
| Route of Exposure | Oral | Inhalation | Oral | Inhalation |
| DEHP | 310 µg/day | N.C. | 410 µg/day | N.C. |

Source: OEHHA's safe harbor levels for TDCIPP, DBP, DEHP, benzene, and formaldehyde. N.C. = not calculated by OEHHA as of August 2020.[75]

109.    When DEHP enters in the human body, it breaks down into specific metabolites. The toxicity of DEHP is mainly attributed to its unique metabolites which include the primary metabolite, mono-(2-ethylhexyl) phthalate (MEHP) and secondary metabolites, mono-(2-ethyl-5-hydroxyhexyl) phthalate (MEHHP), and mono-(2-ethyl-5-oxohexyl) phthalate (MEOHP).[76]

---

[73] Hannon, Patrick et al., *Daily Exposure to Di(2-ethylhexl) Phthalate Alters Estous Cyclicity and Accelerates Primordial Follicle Recruitment Potentially Via Dysregulation of the Phosphatidylinositiol 3-Kinase Signaling Pathway in Adult Mice,* Biology of Reproduction Volume 90, Issue 6, June 2014, 136, 1-11, https://academic.oup.com/biolreprod/article/90/6/136,%201-11/2514356.

[74] Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health,* Healthcare (Basel) 9(5):603, May 18, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/.

[75] Aalekhya Reddam & David Volz, *Inhalation of Two Prop 65-listed Chemicals Within Vehicles May Be Associated with Increased Cancer Risk,* Environmental International Volume 149, April 2021, https://www.sciencedirect.com/science/article/pii/SO16041202100026X.

[76] Saab, Yolande, et. Al., *Risk Assessment of Phthalates and Their Metabolites in Hospitalized Patients: A Focus on Di-and Mono-(2-ethylhexyl) Phthalates Exposure from Intravenous Plastic Bags.* Toxics, 10(7), 357, https://pubmed.ncbi.nlm.nih.gov/35878262/; Istaf Sheikh, et. Al., Endocrine disruption: In silico perspectives of interactions of di-(2-ethylhexyl) phthalate and its five major metabolites with progesterone receptor. BMC Structural Biology Volume 16, Suppl 1, 16, Sept. 30, 2016, https://bmcstructbiol.biomedcentral.com/articles/10.1186/s12900-016-0066-4 (Other secondary metabolites include mono (2-ethyl-5-carboxypentyl) phthalate (5-cx-MEPP) and mono[2-[carboxymethyl)hexylphthalate (2-cx-MMHP)).

27

110. DEHP and its metabolites are known to cause significant adverse health effects including, but not limited to, endometriosis, developmental abnormalities, reproductive dysfunction, and infertility,[77] various cancers, and metabolic syndrome within the human population and their future children.[78]

111. Studies on the health effects of DEHP in laboratory animals used oral inhalation, and dermal exposures.[79]

112. The results of the studies indicate potential associations between DEHP exposure and the following negative health effects:

a) **Reproductive effects:** Epidemiological studies suggest a potential association between DEHP exposure and decreased serum testosterone and altered sperm parameters in males. Available studies on fertility effects in humans do not indicate an association between DEHP exposure and infertility. In animals, the available oral and inhalation studies provide evidence that the male reproductive system, particularly the testes, is susceptible to DEHP toxicity. Evidence from animal studies indicates decreased male and female fertility at high oral doses.

b) **Developmental effects.** Epidemiological studies suggest a potential association between reduced AGD (Anogenital distance) and testicular descent in male infants and prenatal DEHP exposure. In addition, human epidemiological studies provide mixed results for potential relationships between exposure to DEHP and preterm birth, early puberty, and delayed mental and psychomotor development in children. Studies in animals indicate that altered glucose homeostasis and the development of the reproductive system following early life exposure is a particularly sensitive target of DEHP toxicity.

---

[77] Richardson, Kadeem et. Al., *Di(2-ethylhexyl) Phthalate (DEHP) Alters Proliferation and Uterine Gland Numbers in the Uterine of Adult Expose Mice,* Reproductive Toxicology, 77, 70-79, https://pubmed.ncbi.nlm.nih.gov/29458081/.

[78] Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health,* Healthcare (Basel) 9, 603, May 9, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593.

[79] Chapter 2: *Health Effects,* Toxicological profile for Di(2-ethylhexyl) phthalate (DEHP) (2001), https://www.atsdr.cdc.gov/ToxProfiles/tp9-c2.pdf.

113.    The global consumption of DEHP in 2020 was estimated at 3.07 million tons, and global demand for plasticizers continues to rise. The estimated global market of phthalates in 2020 was expected to reach $10 Billion and would still be widely used in plasticizers.[80]

114.    Human epidemiology studies have shown a significant association between phthalates exposures and adverse reproductive health outcomes in both women and men.[81]

115.    DEHP exposure is also significantly related to insulin resistance, consistently higher systolic blood pressure, and other reproduction system problems including early menopause, low birth weight, pregnancy loss, and preterm birth.[82]

116.    When it comes to the impacts on children, epidemiology studies on phthalate toxicity have focused primarily on pregnancy outcomes, genital development, semen quality, precocious puberty, thyroid function, respiratory systems, and neurodevelopment.[83]

117.    Since the turn of the century, restrictions on phthalates have been proposed in many Asian and western countries. In 2008, the US Congress announced the Consumer Protection Safety Act (CPSA) that permanently banned the products, especially children's toys and childcare articles, containing DEHP, DBP, and BBP at levels >0.1% by weight.[84]

---

[80]  *Id.*
[81]  *Id.*
[82]  N.M. Grindler, et al., *Exposure to Phthalate, an Endocrine Disrupting Chemical, Alters the First Trimester Placental Methylome and Transcriptome in Women,* Scientific Reports Volume 8, April 17, 2018, https://doi.org/10.1038/s41598-018-24505-w.
[83]  *Id.*
[84]  Consumer Product Safety Improvement Act of 2008, H.R. 4040, 110th Cong. (2008), https://www.congress.gov/110/plaws/publ314/PLAW-110publ314.pdf.

29

### h. Formaldehyde

118.    Formaldehyde has been classified as a known human carcinogen by both the U.S. Department of Health and Human Services' National Toxicology Program ("NTP") and the IARC.[85]

119.    Specifically, in 2005, IARC published its conclusions regarding formaldehyde: "After a thorough discussion of the epidemiologic, experimental, and other relevant data, the working group concluded that formaldehyde is carcinogenic to humans, based on sufficient evidence in humans and in experimental animals.[86]

120.    Ingredients, including formaldehyde and formaldehyde-releasing chemicals found in chemical hair relaxers and straighteners have played a role in carcinogenesis, "supporting an association between hair product use and cancer development."[87]

121.    Hair straightening and relaxing products have been found to contain a range of endocrine disrupting chemicals, including phthalates and parabens, in addition to formaldehyde.[88]

122.    Formaldehyde is a common ingredient in chemical hair relaxers and straighteners, even in those labeled as "formaldehyde-free," released into the air when the product is heated during application.[89]

---

[85] Pierce J.S., et al. *Characterization of Formaldehyde Exposure Resulting from the Use of Four Professional Hair Straightening Products.* J. Occ. and Environ. Hygiene 2011;8:686-699.

[86] Cogliano V.J., et al. Meeting Report: Summary of IARC Monographs on Formaldehyde, 2-Butoxyethanol, and 1-tert-Butoxy-2Propanol. Environ. Health Perspect. 2005;113:1205–1208. doi:10.1289/ehp.7542 available via http://dx.doi.org/.

[87] Chang C.J., et al. *Use of Straighteners and Other Hair Products and Incident Uterine Cancer.* JNCIL Natl. Cancer Inst. 2022; 114:12,1636-1645. https://doi.org/10.1093/jnci/djac165.

[88] White A.J., et al. *Use of Hair Products in Relation to Ovarian Cancer Risk*. Carcinogenesis. 2021;42:1189-1195. https://doi.org/10.1093/carcin/bgab056.; *see also* Aglan M.A., et al. *Hair Straightening Products and the Risk of Occupational Formaldehyde Exposure in Hairstylists.* Drug and Chemical Toxicology 2020;43:5,488-495. DOI: 10.1080/01480545.2018.1508215.

[89] Pierce J.S., et al. *Characterization of Formaldehyde Exposure Resulting from the Use of Four Professional Hair Straightening Products.* J. Occ. and Environ. Hygiene 2011;8:686-699.

30

**B. Injuries Associated with Exposure to Endocrine Disrupting Chemicals**

    **a. Uterine Cancer**

123.    Uterine cancer is associated with phthalate metabolites found in chemical hair straightening and hair relaxer products.

124.    Uterine cancer[90] is among the fourth most common cancer in women in developed countries,[91] accounting for about 3% of all new cancer cases each year.[92]

125.    Every year around 65,000 women develop uterine cancer in the United States, out of which more than 90% are of endometrial origin. The mean age at diagnosis is 61 years.[93]

126.    The incidence in Black women is twice that of White women.[94] In addition, Black women with uterine cancer carry a poorer prognosis as compared to White women.[95]

127.    Though death rates from other cancers in women have declined in recent years, death rates for uterine cancer have increased by more than 100% in the last 20 years.[96]

128.    Indeed, new cases of uterine cancer have increased by 0.6 percent per year from 2010 to 2019, and death rates have risen an average of 1.7 percent per year during the same period.[97]

---

[90] Otherwise known as endometrial carcinoma.
[91] Unaiza Faizan & Vijayadershan Muppidi, *Uterine Cancer,* In: StatPearls, National Library of Medicine, Jan 2022, https://www.ncbi.nlm.nih.gov/books/NBK562313.
[92] *Cancer State Facts: Uterine Cancer,* National Cancer Institute, https://seer.cancer.gov/statfacts/html/corp.html.
[93] *Id.*
[94] *Id.*
[95] Joel Sorosky, *Endometrial Cancer,* Obstetrics & Gynecology Volume 120, 383-97, Aug. 2012, https://pubmed.ncbi.nlm.nih.gov/22851101/.
[96] Linda Duska, et al., *Treatment of Older Women With Endometrial Cancer: Improving Outcomes with Personalized Care,* American Society Clinical Oncology Educational Book, 35:164-74, 2016, https://pubmed.ncbi.nlm.nih.gov/27249697/.
[97] Jack J. Lee, Rising Endometrial Cancer Rate Spur New Approaches to Prevention, National Cancer Institute: Division of Cancer Prevention, June 28, 2022, https://prevention.cancer.gov/news-and-events/blog/rising-endometrial-cancer.

31

129.    A recent study by the National Cancer Institute found that women who use chemical hair straightening or relaxing products have a considerably higher risk of contracting uterine cancer.[98]

130.    The study found that an estimated 1.64% of women who never used chemical hair straighteners or relaxers would go on to develop uterine cancer by the age of seventy; but for frequent users, that risk more than doubles, increasing to 4.05%.[99]

131.    These risks are more substantial among Black women, who use hair straightening and hair relaxing products the most, including Defendants' Products.

### b. Ovarian Cancer

132.    Ovarian cancer is a rare disease, making up approximately 1% of new cancer cases, with around 20,000 new cases diagnosed in the United States in 2022. Approximately 1.1% of all women will be diagnosed with ovarian cancer. Of the 10.6 per 100,000 women per year who will be diagnosed with ovarian cancer, the death rate is 6.3 per 100,000 women – a 49.7% survival rate.[100]

133.    While overall rates of ovarian cancer are slowly declining in the U.S., attributable in part to increased use of oral contraceptives, Black women continue to have the poorest survival rate across all ovarian cancer subtypes.[101]

---

[98]  Che-Jung Chang, et al., *Use of Straighteners and Other Hair Products and Incident Uterine Cancer,* Journal of the National Cancer Institute, Oct. 17, 2022, https://pubmed.ncbi.nlm.nih.gov/36245087/.
[99]  *Id.*
[100]  *Cancer State Facts; Ovarian Cancer,* National Cancer Institute, https://seer.cancer.gov/statfacts/html/ovary.html.
[101]  Park H.K., et al. *Recent Trends in Ovarian Cancer Incidence and Relative Survival in the United States by Race/Ethnicity and Histologic Subtypes.* Cancer Epidemiol. Biomarkers Prev. 2017;26 (10): 1511-1518. doi: 10.1158/1055-9965.EPI-17-0290.

134.    Another recent publication from the researchers of the Sister Study found the risk of ovarian cancer doubled with frequent use (defined as greater than four times per year) of chemical hair straighteners/relaxers in the previous year as opposed to never use. (HR = 2.19)[102]

135.    While the study was not powered to detect differences based on race/ethnicity, among Black women the hazard ratios were elevated for ever use of straighteners (HR = 1.28) or perms (HR = 1.80). Further, the researchers noted that "given the much higher prevalence of use of these products, the impact of these results is more relevant for African American/Black women."[103]

### c. Endometriosis

136.    Endometriosis is associated with phthalate metabolites found in chemical hair straightening and hair relaxer products.

137.    For Black women in the U.S., endometriosis is one of the most common indications for major gynecological surgery such as a hysterectomy. It is associated with long hospital stays and high hospital costs.[104]

138.    One study demonstrated Phthalate metabolites promote increased endometrial volume, often an indication of fibroids on ultrasound.[105] DEHP increased volume risk by 33% and the sum of androgenic phthalates increased risk by 27%.[106]

---

[102] White A.J., et al. *Use of hair products in relation to ovarian cancer risk.* Carcinogenesis 2021; 42(9):1189-1195.

[103] *Id.*

[104] M.C. Kyama, *The prevalence of endometriosis among African-American and African-indigenous women.* Gynecologic and obstetric investigation, Vol. 57(1) (2004), https://pubmed.ncbi.nlm.nih.gov/14974452.

[105] Amir R. Zota et al., *Phthalates exposure and uterine fibroid burden among women undergoing surgical treatment for fibroids: a preliminary study,* Fertility and sterility, Vol. 111(1) (2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6321778/.

[106] *Id.*

33

139. The function of the uterine lining, the endometrium, is based on cell-cell interactions under the instruction of steroid hormones.[107] Endometriosis, a common cause of female infertility, occurs almost exclusively in menstruating women of reproductive age and often results from disruptions of this well-balanced hormonal cellular equilibrium.[108]

140. It is estimated that 20% to 50% of women being treated for infertility have endometriosis.[109]

141. Endometriosis is a painful, estrogen dependent disease resulting from the growth of endometrial glands and stroma outside the uterus that causes a chronic inflammatory reaction.[110]

142. During the follicular phase of the menstrual cycle, estrogen, working through estrogen receptors[111], induces growth of the endometrium.[112]

---

[107] L. Cobellis et al., *High plasma concentrations of di-(2-ethylhexl)-phthalate in women with endometriosis,* Human Reproduction, Vol. 18, Issue 7 (2003), 1512-1515, https://doi.org/10.1093/humrep/deg254.

[108] D.L. Olive and L. B. Schwartz, *Endometriosis,* The New England J. of Med., Vol. 328(24):1759-69 (1993), https://pubmed.ncbi.nlm.nih.gov/8110213/; K.G. Osteen and E. Sierra-Rivera, *Does disruption of immune and endocrine systems by environmental toxins contribute to development of endometriosis?,* Seminars in Reproductive Endocrinology, Vol. 15 (3):301-8 (1997) https://pubmed.ncbi.nlm.nih.gov/938389/.

[109] *Endometriosis,* World Health Organization (March 31, 2021), https://www.who.int/news-room/fact-sheets/detail/endometriosis.

[110] *Id.*

[111] Illaria Paterni et al., *Estrogen receptors alpha (ERα) and beta (Erβ): subtype-selective ligands and clinical potential,* Steroids, Vol. 90:13-29 (2014), https://pubmed.ncbi.nlm.nih.gov/24971815/.

[112] Kun Yu et al., *Estrogen Receptor Function: Impact on the Human Endometrium,* Frontiers in endocrinology, Vol. 13 (2022), https://pubmed.ncbi.nlm.nih.gov/35285981/.

143.     The developing fetus and the female reproductive tract are particularly susceptible to EDCs.[113] EDCs are known to interfere with hormonal homeostasis, leading to alteration of estrogen signaling.[114] Specifically, DEHP is known to cause enhanced estrogenic activity.[115]

144.     DEHP exposure has been demonstrated to promote atypical cell proliferation and increased uterine volume (weight) in female mice.[116]

145.     Numerous studies, spanning decades, establish that DEHP can lead to the development of endometriosis, as it is known to increase the viability, activity, proliferation, and migration of endometrial stromal cells, a required precondition of endometriosis.[117]

146.     Studies have shown that endometriotic women have significantly higher plasma DEHP concentrations than those without the disease.[118] A study that included a sample size of approximately five hundred women living in various states observed that DEHP's metabolite MEHP was consistently associated with endometriosis.[119]

---

[113]  Saniya Rattan et al., *Di(2-Ethylhexyl) Phthalate Exposure During Prenatal Development Causes Adverse Transgenerational Effects on Female Fertility in Mice,* Toxicol Sci., Vol. 163 (2) (2018), https://www.nci.nlm.nih.gov/pmc/articles/PMC5974785/.

[114]  Xueping Chen et al., *Toxicity and Estrogenic Endocrine Disrupting Activity of Phthalates and Their Mixtures,* Int'l J. Envitl. Res. And Pub. Health, 1(3(:3156-3168 (2014) https://doi.org/10.3390/ijerph110303156.

[115]  Chou CK, Huang HW, Yang CF, Dahms HU, Liang SS, Wang TN, Kuo PL, Hsi E, Tsai EM, Chiu CC. *Reduced camptothecin sensitivity of estrogen receptor-positive human breast cancer cells following exposure to di(2-ethylhexyl)phthalate (DEHP) is associated with DNA methylation changes.* Environ Toxicol. 2019 Apr;34(4):401-414. doi: 10.1002/tox.22694. Epub 2019 Feb 5. PMID: 30720231.

[116]  Juhye Kim, et al., *Chronic Low-Dose Nonylphenol or Di-(2-ethylhexyl) Phthalate has a Different Estrogen-like Response in Mouse Uterus, Development & Reproduction, Vol. 22(4):379-391(2018),* https://pubmed.ncbi.nlm.nih.gov/30680337/.

[117]  *Id.*

[118]  L. Cobellis et al., *High plasma concentrations of di-(2-ethylhexl)-phthalate in women with endometriosis,* Human Reproduction, Vol. 18, Issue 7 (2003), 1512-1515, https://doi.org/10.1093/humrep/deg254  (Concluded that 92.6% of women with endometriosis tested had detectable levels of DEHP and/or its metabolite, MEHP.

[119]  Buck Louis G.M. et al., *Bisphenol A and phthalates and endometriosis: the Endometriosis: Natural History, Diagnosis and Outcomes Study,* Fertility and sterility, Vol. 100(1):162-9.e1-2

35

### d. Breast Cancer

147.    Breast cancer is associated with phthalate metabolites found in hair care products.

148.    In Black women, breast cancer is diagnosed earlier and tends to be more aggressive, resulting in Black women having the highest rates of death due to this disease than any other ethnic/racial group.

149.    The role of environmental exposure to estrogen and EDCs has been studied for good reason. A growing body of evidence links: (1) environmental estrogen and EDC exposures to breast cancer risk, (2) the presence of such chemicals in personal care products, including hair products, and (3) the use of certain hair products with potential breast cancer risk in African Americans.[120]

150.    Numerous, biologically plausible mechanisms have been published in the peer-reviewed medical and scientific literature that support a causal link between hair straighteners and reproductive and/or endocrine-related tumors.

151.    Hormonal imbalances and over-activation of the estrogen, progesterone, and epidermal receptors are associated with development and progression of breast cancer.[121]

152.    Studies have shown that increased breast cancer mortality, poor prognosis, and the recurrence of breast cancer are associated with the higher urinary concentrations of DEHP and its

---

(2013), https://pubmed.ncbi.nlm.nih.gov/23579005/.

[120] Laura Stiel, et al., *A Review of Hair Product Use on Breast Cancer Risk in African American Women*, Cancer Medicine, 5(3):597-604, March 2016, https://pubmed.ncbi.nlm.nih.gov/26773423/.

[121] *Hormone Action in the Mammary Gland*, Cold Spring Harbor Perspectives in Biology, 2(12), December 2010, https://pubmed.ncbi.nlm.nih.gov/20739412/ ; Suzanne Fenton & Linda Birnbaum, *Timing of Environmental Exposures as a Critical Element in Breast Cancer Risk,* The Journal of Clinical Endocrinology & Metabolism, Volume 100, Issue 9, 3245–3250, Sept. 1, 2015, https://academic.oup.com/jcem/article/100/9/3245/2836022.

36

metabolite, MEHP.[122] Studies have also shown that exposure to DEHP increases invasive proprieties of breast cells.[123]

153.    Hormone receptor-negative breast cancer means that cancer cells do not grow in response to the hormones estrogen or progesterone.[124] Receptors are proteins on certain tumor cells that hormones stick to, allowing cancer cells to grow and multiply.

154.    Progesterone is essential for the mammary gland development and has a proliferative effect on epithelial cells.[125] Disruption of the progesterone pathway is known to be a risk factor for breast cancer.[126] Two progesterone receptors are expressed at similar levels in the mammary gland, PR-A and PR-B.

155.    The progesterone receptor gene is an estrogen-regulated gene.[127]

156.    T-47D cells are cancer cells isolated from breast cancer patients and contain the receptors involved in hormone-dependent breast cancer, estrogen, and progesterone receptors.

157.    DEHP and its metabolite, MEHP, increase cell proliferation of T-47D cancerous cells.[128] DEHP and MEHP induce progesterone receptor stimuli, DEHP and MEHP induce

---

[122] Tsung-Hua Hsieh, et al., *DEHP Mediates Drug Resistance by Directly Targeting AhR in Human Breast Cancer*, Biomedicine & Pharmacotherapy, Volume 145, 112400, Nov. 18, 2021, https://pubmed.ncbi.nlm.nih.gov/34801851/.

[123] Belinda Crobeddu, et al., *Di(2-ethylhexyl) Phthalate (DEHP) Increases Proliferation of Epithelial Breast Cancer Cells Through Progesterone Receptor Dysregulation, Environmental* Research, Volume 172, 165-173, June 2019 https://www.sciencedirect.com/science/article/abs/pii/S0013935119301653?via%3Dihub#bib82.

[124] *Id.*

[125] *Id.*

[126] *Id.*

[127] P.A. Mote, et al., *Loss of Co-ordinate Expression of Progesterone Receptors A and B is an Early Event in Breast Carcinogenesis*, Breast Cancer Research and Treatment, 72, 163-172, 2002, https://link.springer.com/article/10.1023/A:1014820500738#citeas.

[128] Belinda Crobeddu, et al., *Di(2-ethylhexyl) Phthalate (DEHP) Increases Proliferation of Epithelial Breast Cancer Cells Through Progesterone Receptor Dysregulation, Environmental* Research, Volume 172, 165-173, June 2019 https://www.sciencedirect.com/science/article/abs/pii/S0013935119301653?via%3Dihub#bib82.

progesterone receptor stimuli, resulting in increased progesterone receptor levels and T-47D cell proliferation.[129]

158. Importantly, when progesterone receptors are purposefully inhibited by administration of a pharmacologic antagonist competitor of the progesterone receptor, it decreases the proliferation of T-47D induced by DEHP and MEHP.[130] Thus, exposure to DEHP and its metabolite increases proliferation of breast cancer cells by activating the progesterone receptor.[131]

159. Estrogen receptor α drives more than 70% of breast cancers.[132]

160. Estrogen receptor-negative breast cancers are a group of tumors with poor prognosis and fewer cancer prevention and treatment strategies compared to estrogen-positive tumors.[133]

161. DEHP metabolites were associated with increased risk of breast cancer as well as uterine leiomyoma due to the EDC's influence on estrogen receptors.[134]

162. Aromatase and estrogen receptor α are two key proteins for the proliferation of endocrine-responsive and endocrine–resistant breast cancers.[135]

---

[129] *Id.*

[130] *Id.*

[131] *Id.*

[132] *Id.*

[133] Thomas C Putti, et al., *Estrogen Receptor-Negative Breast Carcinomas: A Review of Morphology and Immunophenotypical Analysis*, Modern Pathology, 18, 26–35, Aug. 27, 2004, https://www.nature.com/articles/3800255.

[134] Zhiqin Fu, et al., *Association Between Urinary Phthalate Metabolites and Risk of Breast Cancer and Uterine Leiomyoma*, Reproductive Toxicology, 74: 134-142, Sept. 23, 2017, https://pubmed.ncbi.nlm.nih.gov/28951174/.

[135] Hei Jason Chan, et al., *Structural and Functional Characterization of Aromatase, Estrogen Receptor, and Their Genes in Endocrine-Responsive and -Resistant Breast Cancer Cells,* The Journal of Steroid Biochemistry and Molecular Biology, Volume 161, 73-83, July 2016, https://www.sciencedirect.com/science/article/abs/pii/S0960076015300303.

163.     Aromatase is an enzyme involved in the conversion of androgen, such as testosterone, to estrogen, such as 17β-estradiol. It is also a very effective therapeutic target for the treatment of endocrine-responsive breast cancer.[136]

164.     The aryl hydrocarbon receptor (AhR) can form an estrogen receptor α complex, which activates the receptor's response even in the absence of estrogen.[137]

165.     AhR plays an important role in estrogen receptor-negative breast cancer, including the regulation of tumor growth, metastasis,[138] and drug resistance.[139]

166.     AhR functions as a receptor for EDC phthalates and causes drug inactivation. Overexpression of AhR affects cell proliferation and motility and is associated with a poor prognosis in human cancer.[140]

167.     CYP450 is a group of enzymes involved in the estrogen pathway and are considered important candidate genes for the susceptibility to breast carcinoma.[141]

168.     CYP1A1 is a CYP450 enzyme examined extensively for its capacity to activate compounds with carcinogenic properties.[142] Continuous exposure to inhalation chemicals and

---

[136] *Id.*

[137] *Aromatic    Hydrocarbon    Receptor*,    Comprehensive    Toxicology,    2010, https://www.sciencedirect.com/topics/medicine-and-dentistry/aromatic-hydrocarbon-receptor.

[138] The spread of cancer cells from the place where they first formed to another part of the body.

[139] Tsung-Hua Hsieh, et al., *DEHP mediates drug resistance by directly targeting AhR in human breast cancer*, Biomedicine & Pharmacotherapy, Volume 145, Jan. 2022, https://www.sciencedirect.com/science/article/pii/S0753332221011860?via%3Dihub.

[140] *Id.*

[141] Balraj Mittal, et al., *Chapter 4 – Cytochrome P450 in Chapter Susceptibility and Treatment*, Advances in Clinical Chemistry, Volume 71, 77-139, 2015, https://www.sciencedirect.com/science/article/abs/pii/S0065242315000517.

[142] Vasilis Androutsopoulos, et al., *Cytochrome P450 CYP1A1: Wider Roles in Cancer Progression    and    Prevention*,    BMC    Cancer,    Volume    9,    June    16,    2009. https://bmccancer.biomedcentral.com/articles/10.1186/1471-2407-9-187.

environmental carcinogens is assumed to increase the level of CYP1A1 through the AhR.[143] CYP1A1 is a known significant risk factor for breast carcinoma.[144]

169.    CYP1B1 is another CYP450 enzyme involved in the metabolism of potential carcinogens.[145] CYP1B1 expression has been shown to be higher in tumors compared to normal tissues, especially in hormone-related cancers including breast, ovary, and prostate tumors.[146]

170.    A recent study provided a clinical outcome demonstrating that DEHP directly binds to AhR and induces downstream CYP1A1 and CYP1B1 expression through the genomic AhR pathway. This study thus revealed new evidence by which DEHP and AhR are co-involved in breast cancer drug resistance.[147]

171.    This same study also evaluated DEHP metabolites in the urine of approximately 500 breast cancer patients and demonstrated that the metabolite concentration was significantly higher in the recurrent breast cancer group compared with non-recurrent patients.[148]

172.    Urinary concentrations of mono-ethyl phthalate have been positively associated with breast cancer risk, as well as the number of personal care products used, and the use of hair products, among other personal care products, has been significantly associated with urinary phthalate concentration.

---

[143] *Id.*
[144] Tsung-Hua Hsieh, et al., *DEHP mediates drug resistance by directly targeting AhR in human breast cancer*, Biomedicine & Pharmacotherapy, Volume 145, Jan. 2022, https://www.sciencedirect.com/science/article/pii/S0753332221011860?via%3Dihub.
[145] Yeo-Jung Kwon, et al., *Enhances Cell Proliferation and Metastasis through Induction of EMT and Activation of Wnt/β-Catenin Signaling via Sp1 Upregulation*, PLoS One, 11(3), March 16, 2016, https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0151598.
[146] *Id.*
[147] Tsung-Hua Hsieh, et al., *DEHP mediates drug resistance by directly targeting AhR in human breast cancer*, Biomedicine & Pharmacotherapy, Volume 145, Jan. 2022, https://www.sciencedirect.com/science/article/pii/S0753332221011860?via%3Dihub.
[148] *Id.*

173.    Studies published in peer reviewed scientific journals have shown a positive correlation between increased breast cancer risk and adolescent use of hair products that modify hair texture, specifically hair straighteners, perms, and hair dye in Black women in the U.S.[149] The frequency of use is associated with a higher risk of premenopausal breast cancer.

174.    The use of straighteners in the year prior to baseline was associated with an 18% higher risk of breast cancer.[150] In the Women's Circle of Health Study (WCHS), a case-control study of women in New York, use of relaxers before age 12 and between the ages of 13–19 years was positively associated with Endocrine Receptive breast cancer among African-American women; which is consistent with our finding of a suggestive higher risk for Endocrine Receptive tumors.[151]

175.    In the Ghana Breast Health study, use of relaxers was associated with a higher risk overall and risk was elevated regardless of age of first use, including in the youngest age category (<21 years).[152]

176.    A recent study, published in the *Carcinogenesis Journal* by Oxford University, concluded that Black women who used lye-based relaxers at least seven times a year for over 15 years or more had around a 30% increased risk of developing breast cancer, compared with those who used it less frequently.[153]

---

[149] Alexander J. White et al., *Adolescent use of hair dyes, straighteners and perms in relation to breast cancer risk*, Int'l J. of Cancer, Vol. 148(9):2255-2263 (2021), https://pubmed.ncbi.nlm.nih.gov/33252833/.
[150] *Id.*
[151] *Id.*
[152] *Id.*
[153] Patricia F. Coogan et al., *Hair product use and breast cancer incidence in the Black Women's Health Study*, Carcinogenesis, Vol. 42, Issue 7 (July 2021) 924–930, https://doi.org/10.1093/carcin/bgab041.

41

177. The US-based researchers examined data from Boston University's Black Women's Health Study, which assessed the medical diagnoses of 50,000 African American women over a 25-year time period plus variable factors that could impact upon their wellbeing. Between 1997 and 2017, some 95% reported using lye-based relaxers and 2,311 developed breast cancers.[154]

178. Another recent publication from the researchers of the Sister Study found that use of chemical hair straighteners in the year prior to enrollment was associated with an 18% increased risk of breast cancer, with an even higher risk associated with frequent use. Further, "women who used straighteners at least every 5-8 weeks had a 31% higher breast cancer risk."[155]

### e. Uterine Fibroids

179. Uterine fibroids,[156] or uterine leiomyomata, are associated with phthalate metabolites and BPA found in hair care products.[157]

180. Although typically benign, uterine fibroids can cause significant health issues such as excessive menstrual bleeding and pelvic pain, which can significantly affect a woman's quality of life, and may require invasive surgery.[158] It has been estimated that uterine fibroids account for

---

[154] Wise, L. A., Palmer, J. R., Reich, D., Cozier, Y. C., & Rosenberg, L. (2012). Hair Relaxer Use and Risk of Uterine Leiomyomata in African-American Women. *American Journal of Epidemiology*, *175*(5), 432–440. https://doi.org/10.1093/aje/kwr351.

[155] Eberle C.E., et al. *Hair dye and chemical straightener use and breast cancer risk in a large US population of black and white women*. Int. J. Cancer. 2020;147:383-391; White A.J., et al. *Use of hair products in relation to ovarian cancer risk*. Carcinogenesis 2021;42(9):1189-1195.

[156] *Id.*

[157] Uterine fibroids are smooth muscle tumors that typically develop during reproductive years.

[158] Wise, L.A. et al. *Epidemiology of Uterine Fibroids – From Menarche to Menopause*. Clin Obset Gynecol. 2016;59(1):2-24.

42

approximately 30% of all hysterectomies performed on women aged 18-44 years,[159] and are the leading indication for hysterectomy in the U.S.[160]

181.    Black women have a higher prevalence of uterine fibroids and tumors than any other ethnicity/racial group.[161] Specifically, Black women have a two to three times greater incidence of uterine fibroids than White women at all ages, and lower mean ages at first diagnosis and hysterectomy. The authors of one study noted that environmental factors, which would include exposure to EDCs, cannot be ruled out as a possible explanation for this difference.[162] Another study indicated that EDC exposure may contribute to fibroid risk and progression.[163]

182.    It has been estimated that more than 80% of Black women will develop uterine fibroids, with 20% requiring a hysterectomy.[164]

183.    A 2012 study in the *American Journal of Epidemiology* associated fibroid risk with the use of hair relaxers. In the Black Women's Health Study, the authors assessed hair relaxer use in relation to uterine leiomyomata incidence. In 1997, participants reported on hair relaxer use (*i.e.*, age at first use, frequency, duration, number of burns, and type of formulation). From 1997 to 2009, 23,580 premenopausal women were followed for incident uterine leiomyomata. The authors noted that the incidence of uterine leiomyomata was two to three times higher in U.S.

---

[159] *Id.*

[160] *Study of Environment, Lifestyle & Fibroids (SELF)*, National Institute of Environmental Health Sciences, https://www.niehs.nih.gov/research/atniehs/labs/epi/studies/self/index.cfm.

[161] Wise L. A., et al. *Hair Relaxer Use and Risk of Uterine Leiomyomata in African-American Women*. American Journal of Epidemiology. 2012;175(5):432–440. https://doi.org/10.1093/aje/kwr351.

[162] Wise, L.A. et al. *Epidemiology of Uterine Fibroids – From Menarche to Menopause*. Clin Obset Gynecol. 2016;59(1):2-24.

[163] Bariani M. V., et al. *The role of endocrine-disrupting chemicals in uterine fibroid pathogenesis*. Curr Opin Endocrinol Diabetes Obes 2020;27:380-387, doi:10.1097/MED.0000000000000578.

[164] Study of Environment, Lifestyle & Fibroids, https://www.detroitself.org/About.

43

Black women than in U.S. white women, with the lifetime risk estimated to be 80% in U.S. Black women. The study showed positive trends for frequency of use, duration of use, and number of burns: "Among long-term users ($\geq$10 years), the incidence rate ratios for frequency of use categories 3-4, 5-6, and $\geq$7 versus 1-2 times/year were 1.04 […], 1.12 […], and 1.15 […], respectively."[165]

184.     Shirley McDonald of the Hair and Scalp Clinic says, "We now know that many hair products contain chemicals that are considered carcinogenic and/or hormone disrupters, leading to increased risk of medical issues such as fibroids (non-cancerous tumors that grow in the uterus, potentially damaging fertility and leading to a host of other complications). Trichologists see lots of conditions that are likely to be triggered by hair products, particularly central centrifugal cicatricial alopecia, a type of permanent hair loss to the crown area of the scalp."[166]

185.     One study examined the association between exposure to phthalates and measures of uterine fibroid burden, namely fibroid diameter and uterine volume. Associations between uterine volume and certain phthalate metabolites were most pronounced: the sum of DEHP increased volume risk by 33% and the sum of androgenic phthalates increased risk by 27%. The researchers concluded that, "Exposure to some phthalate biomarkers was positively associated with uterine volume, which further supports the hypothesis that phthalates exposures may be associated with fibroid outcomes."[167]

---

[165] Wise L. A., et al. *Hair Relaxer Use and Risk of Uterine Leiomyomata in African-American Women*. American Journal of Epidemiology. 2012;175(5):432–440. https://doi.org/10.1093/aje/kwr351.
[166] *There's Hidden Danger in Black Hair Relaxers*, Houston Fibroids Blog (Oct. 19, 2022), https://houstonfibroids.com/posts/fibroid-symptoms/warning-your-hair-products-could-be-hurting-you/.
[167] Zota A.R., et al., *Phthalates exposure and uterine fibroid burden among women undergoing surgical treatment for fibroids: a preliminary study*. Fertil Steril 2019;111(1):112-121, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6321778/.

186.    In the FORGE study, researchers found that exposure to some phthalates was associated with microRNA expression, an epigenetic modification, in uterine fibroids. They also found that some of those associations varied by race/ethnicity.[168]

## C. Ms. Greer's Use of Hair Relaxing Products

187.    Ms. Greer was first exposed to Defendants' EDCs and phthalate-laden Products around 1984, at or around the age of 20, when she began using Defendants' Products.

188.    Ms. Greer used Defendants' Products by going to professional salons and having them apply Defendants' Products as instructed by Defendants.

189.    Ms. Greer continued using Defendants' Products from around 1984 to 2022, resulting in 38 years of consistent exposure.

190.    Ms. Greer's cosmetologists would keep the Defendants' Products on her hair for the time recommended in the instructions.

191.    There was never any indication, on any of the Defendants' Product's packaging or otherwise, that this normal use could and would cause her to develop endometriosis.

192.    In or around of April 2020, Ms. Greer was diagnosed with endometriosis, requiring a hysterectomy. This diagnosis and injury was caused by Plaintiff's exposure to chemicals in the Defendants' aforementioned hair relaxer Products.

193.    As a result of Defendants' acts and/or omissions, Ms. Greer suffered extreme pain and suffering, and extreme emotional distress.

---

[168] Zota A.R., et al. *Phthalate Exposures and MicroRNA Expression in Uterine Fibroids: The FORGE Study*. Epigenetics Insights 2020;13:1-11.

45

## COUNT I
### (NEGLIGENCE)

194.     Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs 1 through 193 inclusive, with the same force and effect as if more fully set forth herein.

195.     At all relevant times and at the time the Products left the Defendants' control, Defendants knew or should have known that their Products were not safe for human use because they caused unreasonably dangerous side effects, including, but not limited to, endometriosis requiring a hysterectomy.

196.     At all relevant times and at the time the Products left the Defendants' control, Defendants knew or should have known that the safety risks of their Products (i.e., endometriosis) outweighed any benefits the Products may have.

197.     At all relevant times and at the time the Products left the Defendants' control, Defendants knew or should have known that their Products had not been properly, adequately, or sufficiently tested for safety when they were in possession of information that signaled that the Products could cause endometriosis and/or the risk of endometriosis needed further testing and studies prior to its introduction to the market.

198.     At all relevant times and at the time the Products left the Defendants' control, Defendants knew or should have known that the Products were unreasonably dangerous because of inadequate warnings, because they did not adequately warn of its risks of endometriosis, especially when used in the form and manner as provided by Defendants.

199.     At all relevant times and at the time the Products left the Defendants' control, Defendants knew or should have known that the Products were unreasonably dangerous because of their design defects, especially when used in the form and manner as provided by Defendants.

46

200.    At all relevant times and at the time the Products left the Defendants' control, Defendants knew or should have known that the design of the Products posed a substantial likelihood of harm (i.e., endometriosis) to Plaintiff and other users of the Products.

201.    At all relevant times and at the time the Products left the Defendants' control, Defendants knew or should have known that the Products were more dangerous than an ordinary user or consumer, such as Plaintiff, would expect.

202.    At all relevant times and at the time the Products left the Defendants' control, the Products were more dangerous than an ordinary user or consumer, such as Plaintiff, would expect.

203.    Upon information and belief, at all relevant times and at the time the Products left the Defendants' control, the Products were unreasonably dangerous in design because there existed a feasible, safer alternative design for the Products that was capable of preventing Plaintiff's injuries and damages – an alternative design that was and is in the exclusive possession, custody, and control of Defendants.

204.    Upon information and belief, at all relevant times and at the time the Products left the Defendants' control, the Products were unreasonably dangerous in design because there existed a feasible, safer alternative design for the Products, the utility of which outweighed the utility of the design that was actually used for the Products.

205.    Upon information and belief, the safer, feasible alternative design for the Products was a hair straightening treatment that did not contain endocrine disrupting chemicals and/or formaldehyde.

206.    Despite the fact that Defendants knew or should have known that the Products caused unreasonably dangerous side effects, Defendants negligently continued to market, manufacture, distribute, and/or sell the Products to consumers, including the Plaintiff.

47

207. Despite the fact that Defendants knew or should have known that the Products caused unreasonably dangerous side effects, Defendants negligently continued to market, distribute, and/or sell the Products to professional cosmetologists, including Plaintiff's professional cosmetologists.

208. Defendants knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury as a result of their failure to exercise ordinary care, as set forth herein.

209. At all relevant times, the Products were in an unsafe, defective, and inherently and unreasonably dangerous condition, which was dangerous to users, and in particular, the Plaintiff.

210. At all relevant times, given their increased safety risks, the Products were not fit for the ordinary purpose for which they were intended – chemically straightening and/or relaxing hair.

211. At all relevant times, given their increased safety risks, the Products did not meet the reasonable expectations of an ordinary consumer, particularly the Plaintiff.

212. Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promotion, advertising, packaging, sale, and/or distribution of the Products into the stream of commerce, including a duty to assure that the Products would not cause users to suffer unreasonable, dangerous side effects.

213. Defendants had a duty to warn Plaintiff, her professional cosmetologists, and/or the general public of all safety risks associated with the Products, including its increased risk of causing endometriosis.

214. Defendants had a duty to warn Plaintiff, her professional cosmetologists, and/or the general public that the Products had not been adequately and/or sufficiently tested regarding their safety.

215. Defendants had a duty to adequately and sufficiently test the Products.

48

216. Defendants had a duty to design the Products in a manner that was safe for their users.

217. Defendants negligently breached their duties to Plaintiff by failing to exercise ordinary care in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of the Products into interstate commerce in that Defendants knew or should have known that using the Products created a high risk of unreasonable, dangerous side effects, including endometriosis, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

218. The negligence of the Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

219. The negligence of the Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

    a. Promoting, formulating, creating, and/or designing the Products without thoroughly testing them;

    b. Promoting, formulating, creating, and/or designing the Products without adequately testing them;

    c. Not conducting sufficient testing to determine whether the Products were safe for use in that Defendants herein knew or should have known that the Products were unsafe and unfit for use by reason of the dangers to their users;

    d. Promoting, marketing, and/or selling the Products without making proper and sufficient tests to determine the dangers to their users;

49

e.  Negligently failing to adequately and correctly warn the Plaintiff, her professional cosmetologists, and/or the public generally of the dangers of the Products, particularly their increased risk of causing endometriosis;

f.  Failing to provide adequate instructions to Plaintiff and/or her professional cosmetologists regarding safety precautions to be observed by users, handlers, and persons who would reasonably and foreseeably come into contact with, and more particularly, use, the Products;

g.  Failing to test the Products and/or failing to adequately, sufficiently, and properly test the Products;

h.  Negligently advertising and recommending the use of the Products without sufficient knowledge as to their dangerous propensities;

i.  Negligently representing that the Products were safe for use for their intended purpose, when, in fact, they were unsafe;

j.  Negligently representing that the benefits of the Products outweigh their risks;

k.  Negligently designing the Products in a manner which was dangerous to their users;

l.  Concealing information concerning warnings from the Plaintiff and/or her professional cosmetologists in knowing that the Products were unsafe, dangerous, and/or non-conforming with relevant regulations; and

m.  Improperly concealing and/or misrepresenting information from the Plaintiff, her professional cosmetologists, and/or the public generally, concerning the severity of risks and dangers of the Products.

50

220.     Defendants under-reported, underestimated and downplayed the serious dangers of the Products.

221.     Defendants were negligent in the designing, researching, supplying, promoting, packaging, distributing, testing, advertising, warning, marketing, and sale of the Products in that they:

    a.   Failed to use due care in designing the Products so as to avoid the aforementioned risks to individuals when the Products were used for straightening/relaxing hair;

    b.   Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects and risks associated with the use of the Products;

    c.   Failed to warn Plaintiff and/or her professional cosmetologists of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects;

    d.   Failed to conduct adequate testing to determine the safety of the Products and particularly their propensity to cause endometriosis;

    e.   Failed to warn Plaintiff and/or the public generally, prior to actively encouraging the sale of the Products, either directly or indirectly, orally or in writing, about the need for more comprehensive, more regular medical monitoring than usual to ensure early discovery of potentially serious side effects; and

    f.   Were otherwise careless and/or negligent.

51

222. The packaging and/or labeling for the Products were inadequate because they did not warn of the increased risk of endometriosis associated with the Products.

223. The packaging and/or labeling for the Products were inadequate because they did not warn that the Products had not been adequately and/or sufficiently tested for safety.

224. Communications made by Defendants to Plaintiff and/or her professional cosmetologists were inadequate because Defendants failed to warn of the increased risk of endometriosis associated with the Products and/or that the Products had not been adequately and/or sufficiently tested for safety.

225. Upon information and belief, had Plaintiff's professional cosmetologists been warned of the increased risk of endometriosis associated with the Products they would not have used the Products and/or would have provided Plaintiff with adequate warnings regarding the dangers of the Products so as to allow Plaintiff to make an informed decision regarding her use of the Products.

226. Upon information and belief, had Plaintiff's professional cosmetologists been warned that the Products had not been sufficiently and/or adequately tested for safety, they would not have used the Products and/or would have provided Plaintiff with adequate warnings regarding the inadequate and/or inappropriate testing of the Products so as to allow Plaintiff to make an informed decision regarding her use of the Products.

227. Had Plaintiff been warned of the increased risk of endometriosis associated with the Products, she would not have used the Products and/or suffered from endometriosis.

228. Had Plaintiff been warned of the inadequate and/or inappropriate testing of the Products, she would not have used the Products and/or suffered from endometriosis.

52

229.     Defendants' negligence in failing to warn Plaintiff and/or her professional cosmetologists of the dangers associated with their Products was the contributing and/or proximate cause of Plaintiff's injuries, harm, and economic loss which Plaintiff suffered and/or will continue to suffer.

230.     Defendants' negligence in failing to sufficiently and/or adequately test the Products was the contributing and/or proximate cause of Plaintiff's injuries, harm, and economic loss which Plaintiff suffered and/or will continue to suffer.

231.     Defendants' negligence in defectively designing the Products was the contributing and/or proximate cause of Plaintiff's injuries, harm, and economic loss which Plaintiff suffered and/or will continue to suffer.

232.     Plaintiff's injuries and damages arose from a customary, usual, reasonably foreseeable use of the Products by Plaintiff.

233.     Plaintiff's injuries and damages as a result of her use of the Products were foreseeable by Defendants.

234.     As a result of the foregoing negligent acts and omissions, the Plaintiff was caused to suffer serious and dangerous side effects including endometriosis requiring a hysterectomy, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring, and/or medications.

235.     As a result of the foregoing negligent acts and omissions, Plaintiff requires and/or will require more medical care and services and did incur medical, health, incidental, and related expenses.

236. Plaintiff is informed and believes and further alleges that she will in the future be required to obtain further medical and/or hospital care, attention, and services.

## COUNT II
### (DEFECTIVE DESIGN AND FAILURE TO WARN)

237. Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs 1 through 236 inclusive, with the same force and effect as if more fully set forth herein.

238. At all times herein mentioned, the Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, distributed, and/or have recently acquired the Defendants who have designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the Products as hereinabove described that were used by the Plaintiff.

239. That the Products were expected to and did reach the usual consumers, handlers, and persons coming into contact with said Product without substantial change in the condition in which they were produced, manufactured, sold, distributed, and marketed by the Defendants.

240. At those times, the Products were in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, the Plaintiff.

241. At those times, given their increased safety risks, the Products were not fit for the ordinary purpose for which they were intended – chemically straightening and/or relaxing hair. 218. At those times, given their increased safety risks, the Products did not meet the reasonable expectations of an ordinary consumer, particularly, the Plaintiff.

242. The Products designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were defective in design or formulation in that, when they left the hands of the manufacturer and/or suppliers, the foreseeable risks of endometriosis exceeded the benefits associated with the design or formulation of the Products.

54

243. The Products designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were defective in design and/or formulation, in that, when they left the hands of the Defendants manufacturers and/or suppliers, they were unreasonably dangerous, and were more dangerous than an ordinary consumer would expect.

244. The Products designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were defective in design and/or formulation, in that, when they left the hands of the Defendants manufacturers and/or suppliers, Defendants knew or should have known that the design of the Products posed a substantial likelihood of harm (e.g., endometriosis) to Plaintiff and other users of the Products.

245. The Products designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were defective in design and/or formulation, in that, upon information and belief, when they left the hands of the Defendant manufacturers and/or suppliers, a safer feasible alternative design existed that was capable of preventing Plaintiff's injuries and damages – an alternative design that was and is in the exclusive possession, custody, and control of Defendants.

246. Upon information and belief, at all relevant times and at the time the Products left the Defendants' control, the Products were unreasonably dangerous in design because there existed a feasible, safer alternative design for the Products, the utility of which outweighed the utility of the design that was actually being used for the Products.

247. Upon information and belief, the safer, feasible, alternative design for the Products was a hair straightening treatment that did not contain endocrine disrupting chemicals and/or formaldehyde.

55

248.    At all times herein mentioned, the Products were in a defective condition and unsafe, and Defendants knew or had reason to know that said Products were defective and unsafe, especially when used in the form and manner as provided by the Defendants.

249.    Defendants knew, or should have known, that at all times herein mentioned their Products were in a defective condition and were and are inherently dangerous and unsafe.

250.    At the time of the Plaintiff's use of the Products, the Products were being used for the purposes and in a manner normally intended, namely for straightening/relaxing hair.

251.    Defendants with this knowledge voluntarily designed their Products in a dangerous condition for use by the public, and in particular the Plaintiff.

252.    Defendants had a duty to create Products that were not unreasonably dangerous for their normal, intended use.

253.    Defendants breached this duty by creating Products unreasonably dangerous for their normal, intended use.

254.    The Products designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants reached Plaintiff in the same defective and unreasonably dangerous condition in which the Defendants' Products were designed.

255.    Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed defective Products which created an unreasonable risk to the health of consumers and to the Plaintiff, in particular.

256.    The Plaintiff and/or her professional cosmetologists could not, by the exercise of reasonable care, have discovered the Products' defects herein mentioned and perceived their danger.

257. The Products designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were defective due to inadequate warnings or instructions as the Defendants knew or should have known that the Products created a risk of serious and dangerous side effects including endometriosis, as well as other severe and personal injuries which are permanent and lasting in nature and the Defendants failed to adequately warn of said risk.

258. The Products designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were defective due to inadequate warnings and/or inadequate testing.

259. The Products designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were defective due to inadequate post-marketing surveillance and/or warnings because, after Defendants knew or should have known of the risks of serious side effects including endometriosis, as well as other severe and permanent health consequences from the Products, they failed to provide adequate warnings to users of the Products, and continued to improperly advertise, market and/or promote their Products.

260. The Products designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were defective due to inadequate warnings, inadequate testing and/or inadequate post-marketing surveillance, in that, when they left the hands of the Defendants' manufacturers and/or suppliers, they were unreasonably dangerous, and more dangerous than an ordinary consumer would expect.

261. The packaging and/or labeling for the Products were inadequate because they did not warn and/or adequately warn of the increased risk of endometriosis associated with the Products.

57

262. The packaging and/or labeling for the Products were inadequate because they did not warn and/or adequately warn that the Products had not been sufficiently and/or adequately tested for safety risks, including uterine endometriosis.

263. Communications made by Defendants to Plaintiff and/or her professional cosmetologists were inadequate because Defendants failed to warn and/or adequately warn them of the increased risk of endometriosis associated with the Products.

264. Communications made by Defendants to Plaintiff and/or her professional cosmetologists were inadequate because Defendants failed to warn and/or adequately warn them that the Products had not been sufficiently and/or adequately tested for safety risks, including the risk of endometriosis.

265. Upon information and belief, had Plaintiff's professional cosmetologists been warned of the increased risk of endometriosis associated with the Products, they would not have used the Products and/or would have provided Plaintiff with adequate warnings regarding the dangers of the Products so as to allow Plaintiff to make an informed decision regarding her use of the Products.

266. Upon information and belief, had Plaintiff's professional cosmetologists been warned that the Products had not been sufficiently and/or adequately tested for safety risks, including the risk of endometriosis, they would not have used the Products and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing of the Products so as to allow Plaintiff to make an informed decision regarding her use of the Products.

267. Had Plaintiff been warned of the increased risk of endometriosis associated with the Products, she would not have used the Products and/or suffered from endometriosis.

58

268. Had Plaintiff been warned that the Products had not been sufficiently and/or adequately tested for safety risks, including endometriosis, she would not have used the Products and/or suffered from endometriosis.

269. By reason of the foregoing, Defendants have become strictly liable in tort to the Plaintiff for the designing, marketing, promoting, distribution, and selling of a defective Products.

270. Defendants' defective design of and inadequate warnings relating to the Products were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

271. That said defects in Defendants' Products were a substantial factor in causing Plaintiff's injuries.

272. That said defects in Defendants' Products were the proximate cause of Plaintiff's injuries.

273. As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous side effects including endometriosis, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring, and/or medications.

274. As a result of the foregoing acts and omissions, Plaintiff requires and/or will require more medical care and services and did incur medical, health, incidental, and related expenses.

## COUNT III
### (BREACH OF EXPRESS WARRANTY)

275. Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs 1 through 274 inclusive, with the same force and effect as if more fully set forth herein.

59

276. At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed and/or have acquired the Defendants who designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the Products as hereinabove described that were used by Plaintiff.

277. At all relevant times, Defendants reasonably anticipated and expected that individuals such as the Plaintiff would use or be affected by the Products.

278. Upon information and belief, at all relevant times, Defendants expressly warranted to Plaintiff and/or her professional cosmetologists that the Products were safe to use for chemically straightening/relaxing hair.

279. Upon information and belief, at all relevant times, Defendants expressly warranted to Plaintiff and/or her professional cosmetologists that the cosmetic benefit of the Products outweighed any potential dangers and/or risks.

280. Upon information and belief, at all relevant times, the aforementioned express warranties were made to Plaintiff and/or her professional cosmetologists by way of direct-to-consumer marketing, advertisements, and/or the Products' packaging and/or labeling.

281. In or around 1984, Plaintiff began using the Products for chemically straightening/relaxing her hair and her professional cosmetologists applied the Products believing they were safe for their intended use – chemically straightening/relaxing hair.

282. Upon information and belief, Plaintiff and/or her professional cosmetologists obtained the information regarding the side effects of the Products from direct-to-consumer marketing, advertising, and/or the packaging and/or labeling of the Products.

60

283.    Upon information and belief, Defendants expressly warranted, through direct-to-consumer marketing, advertising, and/or the Products' packaging and/or labeling, that the Products were safe to use for chemically straightening/relaxing hair.

284.    As a result of Defendants' express warranties to her, Plaintiff and/or her professional cosmetologists were induced to use the Products from approximately 1984 up to the time of her diagnosis with and treatment for endometriosis.

285.    At all relevant times, Defendants reasonably anticipated and expected that individuals, such as the Plaintiff, and professional cosmetologists, such as Plaintiff's professional cosmetologists, would recommend and/or apply the Products based upon their express warranties.

286.    At all relevant times, Defendants knew or should have known that the Products were unreasonably dangerous because of their increased risk of endometriosis, especially when the Products were used in the form and manner as provided by Defendants.

287.    At all relevant times, Defendants knew or should have known that the Products were unreasonably dangerous because their safety risks outweighed any cosmetic benefit they may have.

288.    At all relevant times, Defendants knew or should have known that the Products had not been sufficiently and/or adequately tested for safety.

289.    The unreasonably dangerous characteristics of the Products were beyond that which would be contemplated by the ordinary user such as Plaintiff, with the ordinary knowledge common to the community as to the Products' characteristics.

290.    The unreasonably dangerous characteristics of the Products were beyond that which would be contemplated by Plaintiff's professional cosmetologist(s), with the ordinary knowledge common to the community as to the Products' characteristics.

61

291. At the time the Products left the Defendants' control, the Products did not conform to Defendants' express warranties because the Products were not safe to use to chemically straighten/relax hair.

292. At the time the Products left the Defendants' control, the Products did not conform to Defendants' express warranties because the cosmetic benefit of the Products does not outweigh any of the dangers and/or risks associated with them.

293. The express warranties made by Defendants regarding the safety of the Products were made with the intent to induce Plaintiff to use the Products and/or her professional cosmetologists to use/apply the Product.

294. Defendants knew and/or should have known that by making the express warranties to Plaintiff and/or her professional cosmetologists, it would be the natural tendency of Plaintiff to use the Products and/or her professional cosmetologists to use/apply the Products.

295. Plaintiff and her professional cosmetologists, as well as members of the general public, relied on the express warranties of the Defendants herein.

296. The express warranties made by Defendants regarding the safety of the Products induced Plaintiff to use the Products and/or her professional cosmetologists to use/apply the Products.

297. Had Defendants not made these express warranties, Plaintiff would not have used the Products and/or, upon information and belief, her professional cosmetologists would not have used/applied the Products.

298. Plaintiff's injuries and damages were directly caused by Defendants' breach of the aforementioned express warranties.

299.    Plaintiff's injuries and damages arose from a reasonably anticipated use of the product by Plaintiff.

300.    Accordingly, Defendants are liable as a result of their breach of express warranties to Plaintiff.

301.    As a result of the foregoing breaches, Plaintiff was caused to suffer serious and dangerous side effects including endometriosis requiring a hysterectomy, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring, and/or medications.

302.    As a result of the foregoing acts and omissions, Plaintiff requires and/or will require more medical care and services and did incur medical, health, incidental, and related expenses.

## COUNT IV
## (BREACH OF IMPLIED WARRANTIES)

303.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs 1 through 302 inclusive, with the same force and effect as if more fully set forth herein.

304.    At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed and/or have acquired the Defendants who designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the Products as hereinabove described that were used by Plaintiff.

305.    At the time Defendants marketed, sold, and distributed the Products for use by Plaintiff, Defendants knew of the use for which the Products were intended and impliedly warranted the Products to be of merchantable quality and safe and fit for ordinary use.

63

306. At all relevant times, Defendants reasonably anticipated and expected that individuals such as the Plaintiff would use or be affected by the Products.

307. At all relevant times, Defendants reasonably anticipated and expected that professional cosmetologists, such as Plaintiff's professional cosmetologists, would recommend and/or use/apply the Products for chemically straightening/relaxing hair.

308. At all relevant times, Defendants impliedly warranted to Plaintiff, her professional cosmetologists, and the public generally that the Products were of merchantable quality and safe and fit for ordinary use in that they were safe to use to chemically straighten/relax hair.

309. At all relevant times, Defendants impliedly warranted to Plaintiff, her professional cosmetologists, and the public generally that the Products were of merchantable quality and safe and fit for ordinary use in that the cosmetic benefit of the Products outweighed any potential dangers and/or risks.

310. At all relevant times, Defendants knew or should have known that the Products were unreasonably dangerous because of their increased risk of endometriosis, especially when used in the form and manner as provided by Defendants.

311. At all relevant times, Defendants knew or should have known that the Products were unreasonably dangerous because their safety risks outweighed any cosmetic benefit they may have.

312. At all relevant times, Defendants knew or should have known that the Products had not been sufficiently and/or adequately tested for safety risks, including risk of endometriosis.

313. The unreasonably dangerous characteristics of the Products were beyond that which would be contemplated by the ordinary user such as Plaintiff, with the ordinary knowledge common to the community as to the Products' characteristics.

64

314. The unreasonably dangerous characteristics of the Products were beyond that which would be contemplated by professional cosmetologists, such as Plaintiff's professional cosmetologists, with the ordinary knowledge common to the community as to the Products' characteristics.

315. At all relevant times and at the time the Products left the Defendants' control, the implied warranties made by Defendants were false, misleading, and inaccurate because the Products were not safe to use to chemically straighten/relax hair in that they carried an increased risk of endometriosis.

316. At all relevant times and at the time the Products left the Defendants' control, the implied warranties made by Defendants were false, misleading, and inaccurate because the cosmetic benefit of the Products did not outweigh any the dangers and/or risks associated with them.

317. At all relevant times and at the time the Products left the Defendants' control, the implied warranties made by Defendants were false, misleading, and inaccurate because the Products had not been sufficiently and/or adequately tested regarding their safety risks, including the risk of endometriosis.

318. Plaintiff relied on Defendants' implied warranties of merchantability and fitness for the ordinary use and purpose relating to the Products.

319. Plaintiff reasonably relied upon the skill and judgment of Defendants as to whether the Products were of merchantable quality and safe and fit for their intended use.

320. Upon information and belief, Plaintiff's professional cosmetologists relied on Defendants' implied warranties of merchantability and fitness for the ordinary use and purpose relating to the Products.

65

321. Upon information and belief, Plaintiff's professional cosmetologists reasonably relied upon the skill and judgment of Defendants as to whether the Products were of merchantable quality and safe and fit for their intended use.

322. As a result of Plaintiff's and/or her professional cosmetologists' reasonable reliance upon Defendants' implied warranties of merchantability and fitness for the ordinary use and purpose relating to the Products, Plaintiff used the Products.

323. The Products were injected into the stream of commerce by the Defendants in a defective, unsafe, and inherently dangerous condition and the Products and materials were expected to and did reach users, handlers, and persons coming into contact with said Products without substantial change in the condition in which they were sold.

324. Defendants herein breached the aforesaid implied warranties, as their Products were not merchantable nor fit for their intended purposes and uses.

325. Plaintiff would not have used the Products and/or, upon information and belief, her professional cosmetologists would not have applied the Products, bur for the aforesaid implied warranties.

326. Plaintiff's injuries and damages were directly caused by Defendants' breach of the aforementioned implied warranties.

327. Plaintiff's injuries and damages arose from a customary, usual, reasonably foreseeable use of the Products by Plaintiff.

328. As a result of the foregoing breaches, Plaintiff was caused to suffer serious and dangerous side effects including endometriosis requiring a hysterectomy, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish,

66

including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring, and/or medications.

329.     As a result of the foregoing acts and omissions, Plaintiff requires and/or will require more medical care and services and did incur medical, health, incidental, and related expenses.

**COUNT V**
**(FRAUDULENT MISREPRESENTATION AND**
**FRAUDULENT CONCEALMENT)**

330.     Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs 1 through 329 inclusive, with the same force and effect as if more fully set forth herein.

331.     Defendants knew or should have known that the Products were not safe to use to chemically straighten/relax hair given their increased risk of endometriosis.

332.     Defendants falsely represented in direct-to-consumer marketing, advertisements, and/or on the packaging and/or labeling of the Products that the Products were safe to use to chemically straighten/relax hair and concealed that the Products were associated with an increased risk of endometriosis.

333.     Defendants knew or should have known that the cosmetic benefit of the Products did not outweigh the dangers and risks associated with the Products.

334.     Defendants falsely represented in direct-to-consumer marketing, advertisements, and/or on the packaging and/or labeling of the Products that the cosmetic benefit of the Products outweighed the dangers and risks associated with the Products.

335.     Defendants knew or should have known that the Products had not been adequately and/or sufficiently tested for safety.

67

336.     Defendants falsely represented in direct-to-consumer marketing, advertisements, and/or on the packaging and/or labeling of the Products that the Products were safe to use to chemically straighten/relax hair and concealed that the Products had not been adequately and/or sufficiently tested for safety.

337.     Defendants' fraudulent representations and/or concealments as identified herein were done with the intent of defrauding and deceiving consumers, including the Plaintiff, professional cosmetologists, and the public generally, which evinced a callous, reckless, willful, depraved indifference to the health, safety, and welfare of the Plaintiff.

338.     Defendants' fraudulent representations and/or omissions as identified herein were done with the intent of inducing consumers, including the Plaintiff, into using the Products to chemically straighten/relax hair, which evinced a callous, reckless, willful, depraved indifference to health, safety, and welfare of the Plaintiff.

339.     Defendants' fraudulent representations and/or omissions as identified herein were done with the intent of inducing professional cosmetologists, including Plaintiff's professional cosmetologists, to recommend and/or use/apply the Products to chemically straighten/relax hair, which evinced a callous, reckless, willful, depraved indifference to health, safety, and welfare of the Plaintiff.

340.     Upon information and belief, when Plaintiff began using the Products to chemically straighten/relax her hair, Plaintiff and/or her professional cosmetologists obtained the information regarding the side effects of the Products from direct-to-consumer marketing, advertisements, and/or the packaging and/or labeling of the Products.

341.     Upon information and belief, Defendants represented to Plaintiff and/or her professional cosmetologists by way of direct-to-consumer marketing, advertisements, and/or the

68

Products' packaging and/or labeling that the Products were safe to use for chemically straightening/relaxing hair in that they were not associated with an increased risk of endometriosis.

342. Upon information and belief, Defendants concealed from Plaintiff and/or her professional cosmetologists by way of direct-to-consumer marketing, advertisements, and/or the Products' packaging and/or labeling that the Products were associated with an increased risk of endometriosis.

343. Upon information and belief, Defendants concealed from Plaintiff and/or her professional cosmetologists by way of direct-to-consumer marketing advertisements, and/or the Products' packaging and/or labeling that the Products had not been tested sufficiently and/or adequately for increased safety risks, including the risk of endometriosis.

344. When Plaintiff began using the Products and throughout her use of the Products, Defendants represented to her and/or her professional cosmetologists by way of the direct-to-consumer marketing, advertisements, and/or Products' packaging and/or labeling that the Products were safe to use to chemically straighten/relax hair in that they were not associated with an increased risk of endometriosis.

345. When Plaintiff began using the Products and throughout her use of the Products, Defendants concealed from her and/or her professional cosmetologists by way of direct-to-consumer marketing, advertisements, and/or the Products' packaging and/or labeling that the Products were associated with an increased risk of endometriosis.

346. When Plaintiff began using the Products and throughout her use of the Products, Defendants concealed from her and/or her professional cosmetologists by way of direct-to-consumer marketing, advertisements, and/or the Products' packaging and/or labeling that the

69

Products had not been tested sufficiently and/or adequately for increased safety risks, including endometriosis.

347.    The aforementioned representations made in the direct-to-consumer marketing, advertisements, and/or packaging and/or labeling of the Products were fraudulently made in that that Defendants concealed that the Products were associated with an increased risk of endometriosis despite their knowledge to the contrary.

348.    The aforementioned representations made in the direct-to-consumer marketing, advertisements, and/or packaging and/or labeling of the Products were fraudulently made in that Defendants concealed that the Products had not been adequately and/or sufficiently tested for safety, including the risk of endometriosis.

349.    Upon information and belief, as a result of the direct-to-consumer marketing, advertisements, and/or packaging and/or labeling for the Products, and particularly as a result of Defendants' fraudulent misrepresentation and concealments contained therein, Plaintiff was induced to and did purchase the Products.

350.    Upon information and belief, as a result of the direct-to-consumer marketing, advertisements, and/or packaging and/or labeling for the Products, and particularly as a result of Defendants' fraudulent misrepresentation and concealments contained therein, Plaintiff's professional cosmetologists was induced to and did recommend and/or apply the Products.

351.    As a result of the direct-to-consumer marketing, advertisements, and/or packaging and/or labeling for the Products, and particularly as a result of Defendants' fraudulent misrepresentation and concealments contained therein, Plaintiff was induced to and did use the Products between approximately 1984 up to the time of her diagnosis with and treatment for endometriosis.

70

352. Upon information and belief, had Plaintiff's professional cosmetologists been told of the increased risk of endometriosis associated with the Products, they would not have recommended/applied the Products and/or would have provided Plaintiff with adequate warnings regarding the dangers of the Products so as to allow Plaintiff to make an informed decision regarding her use of the Products.

353. Upon information and belief, had Plaintiff's professional cosmetologists been told that the cosmetic benefits of the Products, if any, were outweighed by their safety risks, particularly the risk of endometriosis, they would not have recommended/applied the Products and/or would have provided Plaintiff with adequate information regarding the safety of the Products so as to allow Plaintiff to make an informed decision regarding her use of the Products.

354. Upon information and belief, had Plaintiff's professional cosmetologists been told that the Products had not been sufficient and/or adequately tested for safety risks, including the risk of endometriosis, they would not have recommended/applied the Products and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing of the Products so as to allow Plaintiff to make an informed decision regarding her use of the Products.

355. Had Plaintiff been told of the increased risk of endometriosis associated with the Products, she would not have used the Products and/or suffered endometriosis requiring a hysterectomy.

356. Had Plaintiff been told that the cosmetic benefits of the Products were outweighed by their safety risks, particularly the risk of endometriosis, she would not have used the Products and/or suffered from endometriosis.

71

357. Had Plaintiff been told of the lack of sufficient and/or appropriate testing of the Products for safety risks, including the risk of endometriosis, she would not have used the Products and/or suffered from endometriosis.

358. Plaintiff had no way to determine the truth behind Defendants' misrepresentations and concealments as identified herein, and her reliance upon Defendants' representations and concealments was reasonable.

359. Plaintiff's professional cosmetologists had no way to determine the truth behind Defendants' misrepresentations and concealments as identified herein, and their reliance upon Defendants' representations and concealments was reasonable.

360. Defendants had sole access to material facts concerning the defective nature of the Products, and, particularly, their increased risk of endometriosis.

361. Defendants had sole access to material facts concerning the lack of adequate and appropriate testing regarding the safety of the Products.

362. At all relevant times, Defendants were under a duty to disclose to Plaintiff and/or her professional cosmetologists the defective nature of the Products, including but not limited to the heightened risk of endometriosis.

363. At all relevant times, Defendants were under a duty to disclose to Plaintiff and/or her professional cosmetologists that the risks of the Products outweighed any cosmetic benefit they may have.

364. At all relevant times, Defendants were under a duty to disclose to Plaintiff and/or her professional cosmetologists that the Products had not been adequately and/or sufficiently tested.

365.    Defendants breached their duties to disclose the Products' serious safety risks to Plaintiff, her professional cosmetologists, and the public in general.

366.    Defendants could have and should have revealed the truth behind the safety of the Products through various outlets, including direct-to-consumer marketing, advertisements, and/or the packaging and/or labeling for the Products.

367.    Defendants' misrepresentations and concealments concerning the safety of the Products were made purposefully, willfully, wantonly, and/or recklessly, to mislead Plaintiff, and her professional cosmetologists, into reliance, continued use of the Products, and actions thereon, and to cause them to purchase, recommend, and/or use the Products.

368.    Defendants knew that Plaintiff and her professional cosmetologists had no way to determine the truth behind Defendants' misrepresentations and concealments surrounding the Products, as set forth herein.

369.    Plaintiff's injury and damages were proximately caused by Defendants' fraudulent misrepresentations and concealments as set forth herein.

370.    Plaintiff's injury and damages were proximately caused by her reasonable reliance on Defendants' fraudulent misrepresentations and concealments as set forth herein.

371.    Plaintiff's injury and damages were proximately caused by her professional cosmetologists' reasonable reliance on Defendants' fraudulent misrepresentations and concealments as set forth herein.

372.    As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous side effects including endometriosis, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including

diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring, and/or medications.

373. As a result of the foregoing acts and omissions, Plaintiff requires and/or will require more medical care and services and did incur medical, health, incidental, and related expenses.

## COUNT V
## (NEGLIGENT MISRPRESENTATION)

374. Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs 1 through 373 inclusive, with the same force and effect as if more fully set forth herein.

375. Defendants had a duty to make honest and accurate representations to the Plaintiff, her professional cosmetologists, and the public in general regarding the safety of the Products.

376. At all relevant times, Defendants represented to Plaintiff, her professional cosmetologists, and the public in general that the Products were safe to use to chemically straighten/relax hair in that they did not cause an increased risk of endometriosis.

377. The aforementioned representations made by Defendants were, in fact, false because the Products were not safe to use to chemically straighten/relax hair given their increased risk of endometriosis.

378. When said representations were made by Defendants, they knew or should have known those representations to be false.

379. The representations made by Defendants were made to Plaintiff between approximately 1984 up to the time of her diagnosis with and treatment for endometriosis through direct-to-consumer marketing, advertisements, and/or the packaging and/or labeling of the Products.

74

380.     As a result of Defendants' representations through direct-to-consumer marketing, advertisements, and/or the packaging and/or labeling of the Products, Plaintiff was induced to want to use the Products and/or request the use of the Products through her professional cosmetologists.

381.     Upon information and belief, Plaintiff's professional cosmetologists obtained the information regarding the side effects of the Products from direct-to-consumer marketing, advertisements, and/or the packaging and/or labeling of the Products.

382.     Upon information and belief, Defendants represented to Plaintiff's professional cosmetologists by way of direct-to-consumer marketing, advertisements, and/or the packaging and/or labeling of the Products that the Products were safe to use for chemically straightening/relaxing hair.

383.     When Plaintiff began using the Products and throughout her use of the Products, Defendants represented to her by way of direct-to-consumer marketing, advertisements, and/or the packaging and/or the Products' packaging and/or labeling that the Products were safe to use for chemically straightening/relaxing hair and were not associated with an increased risk of endometriosis.

384.     When the aforementioned representations were made by Defendants, Defendants were aware of and/or should have been aware that their representations would induce Plaintiff and/or her professional cosmetologists to use and/or recommend and/or apply the Products.

385.     When the aforementioned representations were made by Defendants, Defendants were aware of and/or should have been aware that the Products were to be used by Plaintiff and/or recommended/applied by Plaintiff's professional cosmetologists in reliance upon their representations regarding the safety of the Products.

386.     At the time the aforementioned representations were made by Defendants and at the time Plaintiff used the Products and her professional cosmetologists recommended/applied the Products, Plaintiff was unaware of the falsity of said representations and reasonably believed them to be true.

387.     Upon information and belief, at the time the aforesaid representations were made by the Defendants and at the time Plaintiff used the Products and/or her professional cosmetologists recommended/applied the Products, her professional cosmetologists were unaware of the falsity of said representations and reasonably believed them to be true.

388.     In reasonable and foreseeable reliance upon said representations, the Plaintiff was induced to and did use the Products.

389.     Upon information and belief, in reasonable and foreseeable reliance upon said representations, the Plaintiff's professional cosmetologists were induced to and did recommend and/or use/apply the Products.

390.     Defendants failed to exercise ordinary care regarding their representations relating to the safety of the Products, while involved in its manufacture, sale, testing, quality assurance, quality control, and/or distribution into interstate commerce, in that Defendants negligently misrepresented the Products' safety and/or the weighing of risk between the safety of the Products.

391.     Defendants breached their duty by misrepresenting the Products' serious safety risks to Plaintiff, her professional cosmetologists, and the public in general.

392.     Upon information and belief, had Plaintiff's professional cosmetologists known these representations regarding the safety of the Products to be false, they would not have recommended and/or used/applied the Products to Plaintiff.

76

393.    Had Plaintiff known these representations regarding the safety of the Products to be false, she would not have used the Products.

394.    Defendants' negligent misrepresentations proximately caused Plaintiff's injuries and damages as alleged herein.

395.    As a result of their misrepresentations, the Plaintiff was caused to suffer serious and dangerous side effects including endometriosis, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

396.    As a result of the foregoing acts and omissions, Plaintiff requires and/or will require more medical care and services and did incur medical, health, incidental, and related expenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants on each of the above-referenced claims and Cause of Action and as follows:

1.    Awarding compensatory damages in excess of $75,000 for past and future damages, including, but not limited to, pain and suffering for severe and permanent personal injuries sustained by Plaintiff, medical care costs, loss of enjoyment of life, consequential damages, together with interest and costs as provided by law;

2.    Awarding punitive and/or exemplary damages as allowed for by law for the wanton, willful, fraudulent, and reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct;

77

3.    Granting Plaintiff such other and further relief as this Court may deem just and proper.

4.    Awarding Plaintiff reasonable attorneys' fees;

5.    Awarding Plaintiff the costs of these proceedings; and

6.    Such other and further relief as this Court deems just and proper.

Dated: March 29, 2023

By:   _s/ Nicholas C. Brown_
Nicholas C. Brown, Esq. (NC 38054)
Tessa G. Cuneo, Esq. (MN 0398863)
Alexandra W. Robertson, Esq. (MN 0395619)
**ASK LLP**
2600 Eagan Woods Drive, Suite 400
St. Paul, MN  55121
Telephone: (651) 289-3867
Fax: (651) 406-9676
E-mail: nbrown@askllp.com
E-mail: tcuneo@askllp.com
E-mail: arobertson@askllp.com

*Counsel for Plaintiff*

78